IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ANGELA ROPER and RENEE JOHNSON, for themselves and all others similarly situated, | : : : : | |
| Plaintiffs, | : : | CIVIL ACTION NO. 18-5270 |
| v. | : : | |
| VERIZON COMMUNICATIONS, INC., VERIZON PENNSYLVANIA LLC, and CELLCO PARTNERSHIP d/b/a VERIZON WIRELESS, | : : : : : | |
| Defendants. | : | |

**MEMORANDUM OPINION**

Smith, J.                                                                                    December 4, 2020

Angela Roper and Renee Johnson have brought claims under the Fair Labor Standards Act ("FLSA"), Pennsylvania Minimum Wage Act ("PMWA"), and Illinois Minimum Wage Law ("IMWL") against their purported former employers, claiming that they were not properly compensated for pre-shift work, meal break work, and post-shift work. The defendants argue that Verizon Communications Inc. did not employ either plaintiff, with Verizon Pennsylvania LLC directly employing Ms. Roper and Cellco Partnership d/b/a Verizon Wireless employing Ms. Johnson. The defendants have now moved for summary judgment on this limited issue and seek to have Verizon Communications dismissed from this action with prejudice. For the following reasons, the court grants the motion for summary judgment.

## I.       PROCEDURAL HISTORY

The plaintiffs, Ms. Roper and Ms. Johnson, filed a class and collective action complaint against two defendants, Verizon Communications Inc. ("VCI") and Cellco Partnership d/b/a

Verizon Wireless ("Cellco"), on December 7, 2018. Doc. No. 1. The defendants separately filed answers and affirmative defenses to the original complaint on February 18, 2019. Doc. Nos. 9, 10. The court held an initial pretrial conference with counsel for the parties on March 21, 2019, during which defense counsel raised concerns about the sufficiency of the allegations in the complaint.

After the initial pretrial conference, the court entered an order (with the agreement of the parties) that the plaintiffs would file an amended complaint by no later than May 10, 2019. Doc. No. 20. The plaintiffs followed this directive and filed an amended collective and class action complaint against VCI, Cellco, and a new defendant, Verizon Pennsylvania LLC ("Verizon Pennsylvania"), on May 10, 2019. Doc. No. 23. In this amended complaint, the plaintiffs generally alleged that, *inter alia*, the defendants, acting as joint employers, violated the FLSA, the PMWA, and the IMWL by failing to compensate the plaintiffs (and all putative collective and class members) during pre-shift work, meal break work, and post-shift work. *See generally* Am. Compl.

On May 16, 2019, the plaintiffs filed a motion for conditional class certification. Doc. No. 24. The defendants filed a motion for an extension of time to file opposition to the motion for conditional certification on May 20, 2019. Although the plaintiffs opposed this motion, the court granted the motion via an order entered on May 29, 2019, after holding a telephone conference with counsel on May 28, 2019.[1] Doc. Nos. 29, 30, 33.

During this telephone conference, in addition to the court discussing the defendants' response deadline for the motion for condition class certification, the defendants raised an issue with the plaintiffs' allegations regarding the joint employer status of the defendants. After discussing this issue with counsel, the court provided the parties with a period of time to conduct

---

[1] Ultimately, the plaintiffs agreed to withdraw the motion to certify the class and filed a motion to withdraw, which the court granted without prejudice. Doc. Nos. 49, 52.

discovery on the joint employer issue and determined that the issue could be resolved via a motion for summary judgment filed thereafter. *See* May 29, 2019 Order at 2, Doc. No. 33.

The defendants separately filed answers to the amended complaint on June 7, 2019. Doc. Nos. 34–36. After multiple extensions for discovery on the issue of joint employer status, the defendants filed their motion for summary judgment on this issue, a statement of undisputed material facts, and a supporting memorandum of law on December 2, 2019. Doc. Nos. 42–44.

On December 23, 2019, the plaintiffs filed a motion to strike exhibits 2, 14, 27, 32, 38, and 39 from the defendants' motion for summary judgment. Doc. No. 45. In the motion, the plaintiffs argued that the defendants,

> in direct violation of the discovery rules and court order, failed to identify Kimberly Barna, Karen Shipman, or Veronica Glennon as having any information relating to Defendants' defenses or summary judgment issues until at least thirty-one days after the Court-ordered discovery deadline, but filed a summary judgment motion that relies heavily on these individuals' undisclosed (and wholly self-serving) testimony.

Mem. of L. in Supp. of Pls.' Mot. to Strike Exs. 2, 14, 27, 32, 38, and 39 from Defs.' Summ. J. Mot. at 4, Doc. No. 45-2. The plaintiffs also filed a motion for leave to take additional discovery on specific issues raised by the defendants' summary judgment motion on January 6, 2020. Doc. No. 47. After a telephone conference with counsel for the parties, the court denied the plaintiffs' motion to strike without prejudice and granted their motion for leave to take additional discovery insofar as the plaintiffs sought to depose Veronica Glennon, Kimberly Barna, and Karen Shipman. Doc. No. 52.

On May 19, 2020, the plaintiffs filed a response in opposition to the defendants' motion for summary judgment as to the issue of joint employer status, which included a statement of genuine issues, a response to the defendants' statement of material facts, and an opposition brief. Doc. No. 62. On June 1, 2020, the defendants filed a reply to the response to the motion. Doc. No.

63. The court held oral argument on the motion on July 1, 2020. Doc. Nos. 64, 65. The motion is ripe for disposition.

## II.     FACTUAL BACKGROUND

VCI is "a holding company that, acting through its subsidiaries, is one of the world's leading providers of communications, information and entertainment products and services to consumers, businesses and governmental agencies." Pls.' Ex. 7, VCI 2018 SEC Form 10-K ("2018 10-K") at ECF p. 2, Doc. No. 62-10;[2] *see also* Defs.' Statement of Material Facts in Supp. of Their Mot. for Summ. J. as to the Issue of Alleged Jt. Employment ("Defs.' Facts") at ¶ 1; Pls.' Resp. to Defs.' Statement of Material Facts in Supp. of Their Mot. for Summ. J. as to the Issue of Alleged Jt. Employment ("Pls.' Resp.") at ¶ 1, Doc. No. 62-2.[3]

### A.     VCI's Connection to Cellco and Verizon Pennsylvania

"Formerly known as Bell Atlantic Corporation (Bell Atlantic), [VCI] [was] incorporated in 1983 under the laws of the state of Delaware." 2018 10-K at ECF p. 2. VCI "began doing business as Verizon on June 30, 2000 following [its] merger with GTE Corporation." *Id.* According to Veronica Glennon, the Manager of Corporate Governance for the Verizon Corporate Resources Group, "VCI . . . is a holding company, so it only owns stock or membership interest in subsidiaries. And the subsidiaries are the ones that do business." Pls.' Ex. 2, Dep. of Veronica Glennon ("Glennon Dep.") at 17:13–17, Doc. No. 62-5. Two of VCI's subsidiaries are Verizon Pennsylvania and Cellco. Defs.' Facts at ¶ 10; Pls.' Resp. at ¶ 10.

VCI has ten executive officers, according to its Form 10k filings with the Securities and Exchange Commission ("SEC"). 2018 10-K at ECF p. 8. One of these VCI executive officers,

---

[2] The plaintiffs attached their exhibits to their document which combines their statement of genuine issues and response to the defendants' statement of material facts. *See* Doc. No. 62.
[3] The plaintiffs' response to the defendants' statement of facts begins on ECF p. 12 of Doc. No. 62-2.

Ronan Dunne, is involved with VCI, Verizon Pennsylvania, and Cellco. Mr. Dunne is the Executive Vice President and President – Verizon Consumer Group of VCI, the President of Cellco, and the CEO and President of Verizon Pennsylvania. Pls.' Ex. 6;[4] 2018 10-K at ECF p. 8. According to the plaintiffs, eleven of Verizon Pennsylvania's 25 officers are also VCI officers. Pls.' Ex. 6. Four of Cellco's 25 officers are also VCI officers. *Id.*

According to its SEC filings, VCI and its subsidiaries employ approximately 144,500 people. *See* 2018 10-K at ECF p. 2 ("We have a highly diverse workforce of approximately 144,500 employees."); *id.* at ECF p. 7 ("As of December 31, 2018, [VCI] and its subsidiaries had approximately 144,500 employees."). These 144,500 individuals are referred to as the "V Team." *See* Pls.' Ex. 1, Dep. of Kimberly A. Barna at 18:20–19:7, Doc. No. 62-4 ("The V Team is Verizon and all of its subsidiaries. **Q. The employees of Verizon and all its subsidiaries?** A. Yes."); Glennon Dep. at 35:12–16 ("Q[.] Who's the V Team? Who's included in that? You said you were on the V Team; right?" "A[.] It would be all Verizon employees."); Pls.' Ex. 9, VCI 2018 Annual Report ("2018 Annual Rep.") at ECF p. 2, Doc. No. 62-12 (referring to Verizon's "talented employees" as "the V Team").

Verizon "require[s]" members of the V Team "to comply with [a] Code [of Conduct] as a condition of continued employment." Pls.' Ex. 10, Code of Conduct at ECF p. 10 n.1, Doc. No. 62-13. The Code of Conduct includes a letter from Verizon's then-CEO, Lowell McAdam, who writes "I know I can count on you to put integrity and ethical business practices at the center of what you do." *Id.* at ECF p. 4. The Code of Conduct also imposes various requirements on V Team members. The Code warns that "[v]iolations of the law, the Code and other company policies, procedures, instructions, practices and the like can lead to disciplinary action up to and including

---

[4] This exhibit is filed under seal.

termination of employment." *Id.* at ECF p. 36. The Code warns that "[s]uch disciplinary action may also be taken against supervisors or executives who condone, permit or have knowledge of improper conduct or fail to take action to prevent and detect violations, such as failure to provide training and failure to supervise subordinates' work." *Id.*

The Code explains that "Verizon monitors employees' use of Verizon's communications devices, computer systems and networks . . . as permitted by law." *Id.* at ECF p. 14. Verizon prohibits V Team members from holding any job that interferes with their work for Verizon. *See id.* at ECF p. 15 ("Outside work should not interfere with your work for Verizon. This limitation also applies to simultaneous employment by Verizon and its subsidiaries, affiliates and joint ventures in which Verizon maintains an ownership interest."). Verizon also requires V Team members to "create accurate records that reflect the true nature of the transactions and activities that they record (including, but not limited to, reporting of time, documenting attendance and absence, productivity, commissions and quality assurance)." *Id.* at ECF p. 19. Verizon mandates that the "benefits plans and programs" that the company "provide[s] as compensation . . . must be used honestly." *Id.* at ECF p. 21.

In 2019, VCI's CEO and officers implemented "Verizon 2.0"—a strategy that restructured how all of Verizon's operating companies (including Verizon Pennsylvania and Cellco) conducted business with customers. Glennon Dep. at 37:1–18. In a 2018 Annual Verizon Report, current CEO Hans Vestberg outlined the objectives of Verizon 2.0. 2018 Annual Rep. These objectives included: (1) "redouble [Verizon's] longstanding commitment to leadership in customer satisfaction"; (2) "deliver revenue and profitability growth, and execute on process improvement initiatives"; (3) expand [Verizon's] lead in 5G and set industry standards with [Verizon's] Intelligent Edge Network architecture"; (4) "foster a diverse organizational environment that

embraces change, sparks curiosity and encourages strategic risk taking"; and (5) "carry forward Verizon's commitment to responsible business practices and making the world a better place." *Id.* at ECF pp. 2–4 (emphasis omitted).

There is an overlap in on-the-ground procedures across Verizon subsidiaries, including the two different subsidiaries in which the plaintiffs worked. "VZ Time is Verizon's timekeeping system." Pls.' Ex. 16, VZ Time Training Materials ("Training Materials") at 1. The memorandum explaining VZ Time references the Verizon Code of Conduct and its mandate to "keep accurate records regarding . . . work time." *Id.* Call center representatives at Cellco and Verizon Pennsylvania received their schedules via IEX, a software application. Defs.' Facts at ¶ 139; Pls.' Resp. at ¶ 139. "IEX[] sends [an employee's] schedule, start/stop times, and exception time codes to VZ Time." Training Materials at 1.[5] Ms. Roper and Ms. Johnson's payroll stubs bear a resemblance in format, though neither one says VCI is the payor. Rather, each paystub bears the name of each employee's respective subsidiary. Pls.' Ex. 19, Doc. No. 62-22.

### B.   Background on Verizon Pennsylvania

### 1.   History of Verizon Pennsylvania

The entity that is now Verizon Pennsylvania has a lengthy history, separate and apart from its relationship with Verizon and VCI. Until January 1, 1984, Verizon Pennsylvania (then-known as The Bell Telephone Company of Pennsylvania) was part of the American Telephone and Telegraph Company ("AT&T"). Defs.' Facts at ¶ 4; Pls.' Resp. at ¶ 4. On November 7, 1983, when The Bell Telephone Company was still part of AT&T, it entered into the operating telephone companies ("OTC") Agreement with the respective C&P Telephone Companies of D.C.,

---

[5] NICE, a publicly traded company, develops and licenses IEX. Defs.' Facts at ¶ 140; Pls.' Resp. at ¶ 140. NICE has more than 2,000 customers and one-and-a-half million end users who use IEX. Defs.' Facts at ¶ 140; Pls.' Resp. at ¶ 140. A variety of financial services, insurance, healthcare, hospitality and travel, retail, technology, energy, and telecommunications companies use IEX. Defs.' Facts at ¶ 141; Pls.' Resp. at ¶ 141.

Maryland, Virginia, and West Virginia; Diamond State Telephone; and New Jersey Bell. Defs.' Facts at ¶ 5; Pls.' Resp. at ¶ 5. The OTC Agreement was a shared services agreement pursuant to which a non-revenue-generating subsidiary called Bell Atlantic Management Services, Inc. provided certain shared services and charged the costs back to the operating telephone companies in the agreement. Defs.' Facts at ¶ 5; Pls.' Resp. at ¶ 5.

On January 1, 1984, a consent decree between the Department of Justice and AT&T divested The Bell Telephone Company of Pennsylvania and 21 other operating telephone companies from AT&T. Defs.' Facts at ¶ 6; Pls.' Resp. at ¶ 6. The consent decree split the 22 operating telephone companies among seven regional holding companies of approximately equal size. Defs.' Facts at ¶ 7; Pls.' Resp. at ¶ 7. Bell Atlantic Corp., one of these seven regional holding companies formed in 1984, served Pennsylvania as Bell of Pennsylvania. Defs.' Facts at ¶ 8; Pls.' Resp. at ¶ 8. In January 1994, Bell of Pennsylvania became known as Bell Atlantic—Pennsylvania, Inc. Defs.' Facts at ¶ 9; Pls.' Resp. at ¶ 9. Public utility commissions regulated and continue to regulate the Pennsylvania company and the operating telephone companies in the surrounding states. Defs.' Facts at ¶ 9; Pls.' Resp. at ¶ 9.

On June 30, 2000, Bell Atlantic Corp. merged with GTE Corporation to form VCI. Defs.' Facts at ¶ 10; Pls.' Resp. at ¶ 10. After this merger, Bell Atlantic—Pennsylvania, Inc. became Verizon Pennsylvania. Defs.' Facts at ¶ 10; Pls.' Resp. at ¶ 10.

Verizon Pennsylvania sells residential telephone service, DSL internet access, and television services. Defs.' Facts at ¶ 11; Pls.' Resp. at ¶ 11. All of these services are transmitted by copper wire or fiber ("FiOS"). Defs.' Facts at ¶ 11; Pls.' Resp. at ¶ 11. Verizon Pennsylvania is still subject to the regulations of the Pennsylvania Public Utility Commission ("PUC"). Defs.' Facts at ¶ 12; Pls.' Resp. at ¶ 12. Certain PUC regulations directly implicate operator-handled calls

and the behavior of customer service representatives. Defs.' Facts at ¶¶ 13–14; Pls.' Resp. at ¶¶ 13–14. In contrast, PUC regulations do not apply to wireless phone companies such as Cellco. Defs.' Facts at ¶ 15; Pls.' Resp. at ¶ 15. Instead, the regulations indicate phone users should direct complaints about phone companies to local municipalities or the Federal Communications Commission ("FCC"). Defs.' Facts at ¶ 15; Pls.' Resp. at ¶ 15.

## 2.    Union Representation for Verizon Pennsylvania Call Center Employees

Over the course of Verizon Pennsylvania's lengthy history, a union has represented call center representatives in collective bargaining. Defs.' Facts at ¶¶ 19–20; Pls.' Resp. at ¶¶ 19–20. Currently, Communication Workers of America, AFL-CIO, acting on behalf of its affiliated Local Union, Pennsylvania Telephone Guild/CWA Local 13500 ("Union"), represents the call center representatives in collective bargaining. Defs.' Facts at ¶ 19; Pls.' Resp. at ¶ 19. Verizon Pennsylvania and its predecessors have not unilaterally set the terms and conditions of call center representatives since 1984. Defs.' Facts at ¶ 22; Pls.' Resp. at ¶ 22. Instead, Verizon Pennsylvania has consulted and negotiated with the Union, as required by the National Labor Relations Act. Defs.' Facts at ¶ 22; Pls.' Resp. at ¶ 22. Ms. Glennon indicated that the "Verizon labor relations department" is "responsible, to [her] knowledge, for all collective bargaining agreements applying to the 'V Team.'" Glennon Dep. at 61:15–63:4. The "V Team" includes "all Verizon employees." *Id.* at 35:12–16.

The collective bargaining agreement requires that Verizon Pennsylvania pay call center representatives, like Ms. Roper, for all time worked and permits the Union to grieve and arbitrate a failure to pay. Defs.' Facts at ¶ 25; Pls.' Resp. at ¶ 25. The collective bargaining agreement requires payment of daily overtime for hours worked in excess of 7.5 hours per day (even if hours for the week total 40 hours or less); premiums for part-hours worked (*i.e.* if an employee worked

31 minutes of overtime, she receives 45 minutes of overtime pay); and double time for hours worked in excess of 49 hours in a week. Defs.' Facts at ¶ 27; Pls.' Resp. at ¶ 27.

### 3.   The Inner workings of Verizon Pennsylvania

Verizon Pennsylvania has not hired any call center representatives since January 2017. Defs.' Facts at ¶ 30; Pls.' Resp. at ¶ 30. During this hiring period, Verizon Pennsylvania on-site call center managers conducted in-person candidate interviews at the call centers where the prospective applicants would work. Defs.' Facts at ¶ 31; Pls.' Resp. at ¶ 31. The majority of these interviews occurred in Robinson Township, Pennsylvania. Defs.' Facts at ¶ 31; Pls.' Resp. at ¶ 31.

Once hired, Verizon Pennsylvania call center representatives are designated to be part of teams. Defs.' Facts at ¶ 33; Pls.' Resp. at ¶ 33. Each team is supervised by a Verizon Pennsylvania first-level manager (also called a "team leader"). Defs.' Facts at ¶ 33; Pls.' Resp. at ¶ 33. Team leaders sit in cubicles near the call center representatives whom the leaders supervise and monitor the call center representatives as they handle customer calls. Defs.' Facts at ¶ 36; Pls.' Resp. at ¶ 36. The leaders engage in immediate coaching or corrective action when necessary. Defs.' Facts at ¶ 36; Pls.' Resp. at ¶ 36.

A team in Williamsport, Pennsylvania that an on-site Williamsport manager oversees generates work schedules for Verizon Pennsylvania employees. Defs.' Facts at ¶ 52; Pls.' Resp. at ¶ 52. Pursuant to the collective bargaining agreement, Verizon Pennsylvania call center representatives need to be able to access work schedules by 3 p.m. two Thursdays prior to the date those work schedules come into effect. Defs.' Facts at ¶ 49; Pls.' Resp. at ¶ 49.

Verizon creates and maintains call center representatives' personnel files in the specific locations where those representatives work. Defs.' Facts at ¶ 58; Pls.' Resp. at ¶ 58. Call center managers locally create, keep, and maintain records beyond personnel files, including disciplinary

information related to grievance meetings, sick day records, attendance and tardy records, disability-absence records, medical restrictions, and FMLA use. Defs.' Facts at ¶ 58; Pls.' Resp. at ¶ 58.

Managers have the discretion to dictate the standards the call center representatives must meet. With regard to these standards, managers published an employee handbook at call centers where call center representatives handle only technical support. Defs.' Facts at ¶ 59; Pls.' Resp. at ¶ 59.

Verizon Pennsylvania managers have the power to employ disciplinary action in the form of verbal warnings, written warnings, suspensions, or dismissals against employees for poor attendance, poor performance, or misconduct. Defs.' Facts at ¶ 37; Pls.' Resp. at ¶ 37. Prior to disciplining a call center representative, the team leader collects necessary background information and convenes an investigatory interview of the call center representative. Defs.' Facts at ¶ 38; Pls.' Resp. at ¶ 38. The interview occurs at the call center where the representative works and includes an on-site Union steward and a second manager, who takes notes on behalf of Verizon Pennsylvania. Defs.' Facts at ¶ 39; Pls.' Resp. at ¶ 39. After gathering the facts, the team leader determines if there is cause for discipline, considering the employee's prior disciplinary history and the severity of the behavior in question. Defs.' Facts at ¶ 40; Pls.' Resp. at ¶ 40. If there is cause for discipline, the team leader determines what the punishment should be. Defs.' Facts at ¶ 40; Pls.' Resp. at ¶ 40. During this process, the team leader may consult with other managers or a labor relations manager to ensure the company is disciplining employees in a consistent manner for various types of behavior. Defs.' Facts at ¶ 41; Pls.' Resp. at ¶ 41.

The collective bargaining agreement vests the Union with the right to file grievances alleging breaches of negotiated terms. Defs.' Facts at ¶ 43; Pls.' Resp. at ¶ 43. The negotiated

terms of the collective bargaining agreement provide that grievances should "first be discussed between the employee(s) involved and the immediate supervisor." Defs.' Facts at ¶ 44; Pls.' Resp. at ¶ 44. "If the matter cannot be suitably adjusted in this manner, it will be reviewed by a Representative or Representatives of the Union and the immediate supervisor." Defs.' Facts at ¶ 44; Pls.' Resp. at ¶ 44. At the Verizon Pennsylvania call center, if the team leader denies the grievance at the first step of the grievance process, "the Union shall, at its option, present the grievance to the second-tier or third-tier supervisor, or his or her designated representative[,]" who is often a lower-level call center manager. Defs.' Facts at ¶¶ 46–47; Pls.' Resp. at ¶¶ 46–47. There are no directors, officers, or employees of VCI involved in hearing or considering grievances that the Union files on behalf of Verizon Pennsylvania employees.[6] Defs.' Facts at ¶ 48; Pls.' Resp. at ¶ 48.

If Verizon Pennsylvania engages in layoffs, the collective bargaining agreement dictates the sequence in which Verizon Pennsylvania must conduct those layoffs. Verizon Pennsylvania must first lay off occasional, term and temporary employees, then recent hires, and then any remaining employees in inverse order of seniority. Defs.' Facts at ¶ 34; Pls.' Resp. at ¶ 34. Unless Verizon Pennsylvania conducts layoffs, it can only dismiss call center representatives for cause under Article 12 of the collective bargaining agreement. Defs.' Facts at ¶ 35; Pls.' Resp. at ¶ 35. If Verizon Pennsylvania dismisses a call center representative for cause, the Union can first grieve the discipline and then have a neutral arbitrator review the circumstances surrounding the action and determine if there was cause for the termination; if there was not cause, the arbitrator can order

---

[6] The court recognizes that the plaintiffs contest this fact (and many other facts where the court indicates that VCI employees were not involved in certain aspects of Verizon Pennsylvania and Cellco's operations) insofar as they assert that all employees of VCI's subsidiaries are employees of VCI. The court addresses this argument later in this opinion.

a make-whole remedy of reinstatement plus lost wages and benefits. Defs.' Facts at ¶ 35; Pls.'

Resp. at ¶ 35.

### 4. Plaintiff Angela Roper

Prior to working at Verizon Pennsylvania, Ms. Roper worked in a T-Mobile call center.

Defs.' Facts at ¶ 78; Pls.' Resp. at ¶ 78. Verizon Pennsylvania hired Ms. Roper as a cell-center

representative at its Lehigh Call Center on January 25, 2007. Defs.' Facts at ¶ 77; Pls.' Resp. at

¶ 77. Once Verizon Pennsylvania hired Ms. Roper, she needed to join the Union. Defs.' Facts at ¶

81; Pls.' Resp. at ¶ 81. At Verizon Pennsylvania, Ms. Roper used the Avaya system to receive calls

and the CoFEE database to access customer account information. Defs.' Facts at ¶ 84; Pls.' Resp.

at ¶ 84.

On-site managers carefully monitored Ms. Roper on a daily basis. Defs.' Facts at ¶ 85; Pls.'

Resp. at ¶ 85. As Ms. Roper explained, the managers

> would talk to [call center representatives], hold conversations, send [them] instant
> messages, walk over to [them], tell [them] to put [the] customer on hold while they
> talk to [the call center representative]. They would be sitting there with a headset
> listening to [the] call side by side while they carry on conversations with [the call
> center representative] about what exactly they want [the representative] to say.

Defs.' Facts at ¶ 85; Pls.' Resp. at ¶ 85. Call center managers went through Ms. Roper's calls with

a "fine tooth comb." Defs.' Facts at ¶ 86; Pls.' Resp. at ¶ 86.

Under this scrutiny, Ms. Roper faced a slew of work-related complaints at Verizon

Pennsylvania. On-site managers acted unilaterally in identifying and taking action to address any

instance of Ms. Roper's perceived substandard performance or unacceptable workplace behavior.

Defs.' Facts at ¶ 88; Pls.' Resp. at ¶ 88. For example, on April 2, 2013, Ms. Roper fielded a call

from a customer who complained of charges on her bill. Defs.' Facts at ¶ 89; Pls.' Resp. at ¶ 89.

A first-level Verizon Pennsylvania manager who was Ms. Roper's supervisor at the Lehigh Call

Center observed the call and determined that Ms. Roper gave the caller incorrect information. Defs.' Facts at ¶ 89; Pls.' Resp. at ¶ 89. Three days later, the manager met with Ms. Roper and an on-site Union representative. Defs.' Facts at ¶ 90; Pls.' Resp. at ¶ 90. The manager reviewed the call and gave Ms. Roper a written warning for violating the Code of Conduct. Defs.' Facts at ¶ 90; Pls.' Resp. at ¶ 90. The warning indicated that Ms. Roper would face further discipline in the future up to and including dismissal if there were additional similar incidents. Defs.' Facts at ¶ 90; Pls.' Resp. at ¶ 90.

On April 15, 2013, the first-level Verizon Pennsylvania manager again observed Ms. Roper and flagged four of her calls as deficient. Defs.' Facts at ¶ 91; Pls.' Resp. at ¶ 91. Three days later, the manager again met with Ms. Roper and the Union representative. Defs.' Facts at ¶ 92; Pls.' Resp. at ¶ 92. Again, the manager issued a written warning. Defs.' Facts at ¶ 92; Pls.' Resp at ¶ 92.

In November 2013, the first-level Verizon Pennsylvania manager observed Ms. Roper and flagged four of her calls as deficient. Defs.' Facts at ¶ 93; Pls.' Resp. at ¶ 93. The next day, the manager met with Ms. Roper and a Union representative, and suspended Ms. Roper for three days. Defs.' Facts at ¶ 93; Pls.' Resp. at ¶ 93.

In May 2014, Donna Stufflet, a different Lehigh Call Center manager employed by Verizon Pennsylvania, received a report that Ms. Roper fell asleep at her desk for 23 minutes. Defs.' Facts at ¶ 94; Pls.' Resp. at ¶ 94. That day, the manager met with Ms. Roper, a Union representative, and another Lehigh Call Center employee. Defs.' Facts at ¶ 94; Pls.' Resp. at ¶ 94. During the meeting, the manager suspended Ms. Roper for a period of 20 days. Defs.' Facts at ¶ 95; Pls.' Resp. at ¶ 95. Ms. Stufflet attests that she and the other Verizon Pennsylvania manager "likely consulted with the other call-center supervisors, managers, or a labor relations manager, which

14

was customary" before advising Ms. Roper of the suspension. Defs.' Ex. 19, Decl. of Donna G. Stufflet at ¶¶ 24–25, Doc. No. 43-24.[7]

After this incident, Ms. Roper came to work on several occasions in attire that Lehigh Call Center managers deemed inappropriate. Defs.' Facts at ¶ 97; Pls.' Resp. at ¶ 97. On the first occasion, Ms. Roper wore a spaghetti strap tank top. Defs.' Facts at ¶ 97; Pls.' Resp. at ¶ 97. Ms. Stufflet advised Ms. Roper that spaghetti strap tank tops are inappropriate for work and asked her to put on a sweater. Defs.' Facts at ¶ 97; Pls.' Resp. at ¶ 97. Ms. Roper put on a sweater, but then took it off. Defs.' Facts at ¶ 97; Pls.' Resp. at ¶ 97. Ms. Stufflet convened an investigatory meeting with Ms. Roper, a Union representative, and another manager from a different call center. Defs.' Facts at ¶ 97; Pls.' Resp. at ¶ 97. During the meeting, Ms. Roper told Ms. Stufflet that her "heart is black and cold"; that God would "find a way to teach [her] a lesson"; and that "something bad is going to happen to [her]." Defs.' Facts at ¶ 98; Pls.' Resp. at ¶ 98. Ms. Stufflet suspended Ms. Roper for the rest of the day for insubordination. Defs.' Facts at ¶ 98; Pls.' Resp. at ¶ 98.

The next day, Ms. Stufflet met with Ms. Roper, a Union representative, and another Lehigh Call Center representative again to discuss the incident. Defs.' Facts at ¶ 100; Pls.' Resp. at ¶ 100. Ms. Stufflet suspended Ms. Roper for the rest of the day due to the previous day's behavior. Defs.' Facts at ¶ 101; Pls.' Resp. at ¶ 101.

The following day, June 25, 2014, Ms. Roper came to work wearing a sheer white shirt that exposed a black bra under the shirt. Defs.' Facts at ¶ 102; Pls.' Resp. at ¶ 102. A Union-represented staff clerk complained to a manager that "someone may want to address [Ms. Roper's] attire" because "[s]he's wearing a completely sheer shirt with a black sports bra under it. I can see through her shirt from the other side of the office." Defs.' Facts at ¶ 102; Pls.' Resp. at ¶ 102. Ms.

---

[7] The defendants' exhibits are attached to their statement of undisputed material facts.

Stufflet convened an investigatory interview with Ms. Roper, a Union representative, and another Verizon Pennsylvania manager. Defs.' Facts at ¶ 102; Pls.' Resp. at ¶ 102. After the interview, Ms. Stufflet suspended Ms. Roper for three days. Defs.' Facts at ¶ 102; Pls.' Resp. at ¶ 102.

Two weeks later, on July 7, 2014, Ms. Roper reported to work dressed inappropriately again. Defs.' Facts at ¶ 103; Pls.' Resp. at ¶ 103. A different Lehigh Call Center manager named James Joseph convened an investigatory interview with Ms. Roper, a Union representative, and another Verizon Pennsylvania manager. Defs.' Facts at ¶ 103; Pls.' Resp. at ¶ 103. After this interview, Mr. Joseph suspended Ms. Roper for ten days. Defs.' Facts at ¶ 103; Pls.' Resp. at ¶ 103.

The Union grieved the Lehigh Call Center managers' discipline of Ms. Roper. Defs.' Facts at ¶ 104; Pls.' Resp. at ¶ 104. On October 24, 2014, two Union representatives met with Executive Vice President Julie Daloisio and two Verizon Pennsylvania managers for a contractually-mandated grievance meeting. Defs.' Facts at ¶ 104; Pls.' Resp. at ¶ 104. Verizon Pennsylvania denied each of the grievances. Defs.' Facts at ¶ 104; Pls.' Resp. at ¶ 104. Ms. Daloisio is not one of the individuals who also serves as an officer of VCI. Pls.' Ex. 6.

On November 24, 2014, Ms. Roper came to work dressed inappropriately again. Defs.' Facts at ¶ 106; Pls.' Resp. at ¶ 106. She wore a sheer dress that showed her undergarments. Defs.' Facts at ¶ 106; Pls.' Resp. at ¶ 106. An on-site Lehigh Call Center manager convened an investigatory interview with Ms. Roper, an on-site Union representative, and another Verizon Pennsylvania manager. Defs.' Facts at ¶ 106; Pls.' Resp. at ¶ 106. After the interview, the on-site manager suspended Ms. Roper for 20 days. Defs.' Facts at ¶ 106; Pls.' Resp. at ¶ 106.

The Union grieved the 20-day suspension. Defs.' Facts at ¶ 107; Pls.' Resp. at ¶ 107. The grievance minutes reflect that the Verizon Pennsylvania manager, Mr. Joseph, observed Ms. Roper's clothing and decided to discipline her. Defs.' Facts at ¶ 107; Pls.' Resp. at ¶ 107.

Ultimately, the parties settled Ms. Roper's various grievances and an EEOC charge of discrimination via written agreement. Defs.' Facts at ¶ 108; Pls.' Resp. at ¶ 108.

### C.   Cellco Partnership d/b/a Verizon Wireless ("Cellco")

#### 1.   History of Cellco

On July 1, 1995, Bell Atlantic Corporation and NYNEX Corporation combined most of their domestic business into Cellco Partnership doing business as Bell Atlantic NYNEX Mobile ("BANM"), which provided wireless services to customers in the Northeast, mid-Atlantic, Southeast and Southwest. Defs.' Facts at ¶ 61; Pls.' Resp. at ¶ 61. Neither Bell Atlantic nor NYNEX could participate in the cellular industry without complying with the FCC's cellular separation regulations, which sprung out of the FCC's dismantling of AT&T in 1984. Defs.' Facts at ¶ 65; Pls.' Resp. at ¶ 65. These regulations required, *inter alia*, (1) regional holding companies that derived from the AT&T breakup to form a separate corporation for any owned cellular affiliate; (2) the separate cellular corporation to operate independently from the parent; (3) the separate cellular corporation to have separate books of accounting; (4) the separate cellular corporation to have separate officers; (5) the separate cellular corporation to employ separate operating, marketing, installation and maintenance personnel; and (6) the separate cellular corporation to have separate physical facilities for cellular service. Defs.' Facts at ¶ 65; Pls.' Resp. at ¶ 65. Informed by the regulations, Cellco functioned as a distinct entity and conducted business separate and apart from its indirect parents. Defs.' Facts at ¶ 63; Pls.' Resp. at ¶ 63. Cellco managed its own compensation program, benefit plans, and personnel policies. Defs.' Facts at ¶ 63; Pls.' Resp. at ¶ 63.

In 2000, Bell Atlantic and NYNEX amended their Partnership Agreement to add European telephone carrier Vodaphone to the partnership. Defs.' Facts at ¶ 66; Pls.' Resp. at ¶ 66. Cellco

changed its "doing business as" name to Verizon Wireless. Defs.' Facts at ¶ 66; Pls.' Resp. at ¶ 66. Vodaphone maintained a 45 percent stake in Cellco until 2014 when VCI completed an acquisition of Vodaphone's stake. Defs.' Facts at ¶ 66; Pls.' Resp. at ¶ 66.

Cellco remains a partnership, comprised of partners that VCI owns. Defs.' Facts at ¶ 67; Pls.' Resp. at ¶ 67. Throughout its entire history, Cellco has had its own human resources infrastructure, real estate holdings and management, and supply chain. Defs.' Facts at ¶ 67; Pls.' Resp. at ¶ 67.

## 2.     Hiring, Supervision, and Firing at Cellco

Ms. Johnson worked at the Cellco call center in Rolling Meadows, Illinois. Defs.' Facts at ¶ 68; Pls.' Resp. at ¶ 68. Khem Davis was the highest-level manager in the Tech Support Cue at the Rolling Meadows site at the time in question. Defs.' Ex. 12, Decl. of Khem Davis ("Davis Decl.") at ¶¶ 3–4, Doc. No. 43-17. Katherine Grimaldi and Ilka Nunez were Cellco's on-site human resources managers. Defs.' Facts at ¶ 68; Pls.' Resp. at ¶ 68. Ms. Nunez was the highest-ranking human resources employee at the site. Defs.' Ex. 13, Decl. of Ilka Nunez ("Nunez Decl.") at ¶ 4, Doc. No. 43-18.

Cellco call center representatives can bid for scheduling preferences. Defs.' Facts at ¶ 73; Pls.' Resp. at ¶ 73. The employees bid based on a combination of seniority and performance in contrast to the employees at Verizon Pennsylvania, who bid based solely on seniority. Defs.' Facts at ¶ 73; Pls.' Resp. at ¶ 73. No one from VCI or Verizon Pennsylvania was involved in generating Rolling Meadows Call Center representatives' schedules. Defs.' Facts at ¶ 74; Pls.' Resp. at ¶ 74. Rolling Meadows Call Center representatives usually received a schedule for an eight-hour shift and 40-hour work week. Defs.' Facts at ¶ 74; Pls.' Resp. at ¶ 74. If call center representatives

reported more than 40 hours of work in a week, they received 1.5 times their usual pay. Defs.' Facts at ¶ 74; Pls.' Resp. at ¶ 74.

Ms. Davis oversaw managers and the tech experts who reported to managers. Davis Decl. at ¶ 5. In this capacity, Ms. Davis hired, coached, counseled, and fired tech experts in the Tech Support Cue. *Id.* at ¶ 10. After interested candidates submitted applications online and Verizon Wireless recruiters screened those applications, Ms. Davis interviewed applicants. *Id.* at ¶ 14. When hiring for supervisor roles, although she consulted with other Verizon Wireless Senior Managers at the Rolling Meadows Call centers, she claims she "never consulted with any officers, directors, or employees of VCI or Verizon Pennsylvania in connection with [her] hiring decisions." *Id.*

Ms. Davis regularly listened to the tech experts' calls in the Rolling Meadows call center to assist with coaching. *Id.* at ¶ 10. Ms. Davis affirms that she "never consulted with any officer, director, or employee of [VCI], nor with any officer, director, or employee of [Verizon Pennsylvania]" in connection with her job duties. *Id.* at ¶ 11.

As for Ms. Nunez, she oversaw all Rolling Meadows Call Center Human Resources functions, including all aspects of employee relations, performance management, and benefits administration. Nunez Decl. at ¶ 4. According to Ms. Nunez, Cellco managers consulted with on-site human resources representatives when disciplining employees. *Id.* at ¶ 7. In turn, the human resource representatives consider managers' recommendations, opinions, and input to then advise managers about how they should discipline employees. *Id.* Whenever Ms. Nunez makes decisions related to employees, she states that she does so without input from any officers, directors, or employees of VCI or Verizon Pennsylvania. *Id.* at ¶ 6.

As the highest-ranking human resources employee, Ms. Nunez has access to records at the Rolling Meadows Call Center containing the Center's employees' personnel files, work history, records of historical compensation, attendance and absences, vacation usage, personal day usage, Family Medical Leave Act usage, and coaching sessions. *Id.* at ¶ 10. These records are electronically stored and maintained locally, and they are only accessible by individuals within a particular employee's management chain and Verizon Wireless HR managers. *Id.*

### 3.     Plaintiff Renee Johnson

Ms. Johnson began her employment with Cellco on September 16, 2002, and she worked as an at-will employee without the rights or protections of a collective bargaining agreement. Defs.' Facts at ¶¶ 69, 109; Pls.' Resp. at ¶¶ 69, 109. Initially, Ms. Johnson worked at the Cellco location in Elgin, Illinois. Defs.' Facts at ¶ 112; Pls.' Resp. at ¶ 112.

In February 2007, Ms. Johnson received a promotion from cellular account activations to technical support. Defs.' Facts at ¶ 110; Pls.' Resp. at ¶ 110. The promotion increased Ms. Johnson's annual salary from $37,707.00 to $41,477.70. Defs.' Facts at ¶ 111; Pls.' Resp. at ¶ 111. Ms. Johnson interviewed for that promotion at the Elgin, Illinois Cellco center where she worked. Defs.' Facts at ¶ 112; Pls.' Resp. at ¶ 112. Once promoted, Ms. Johnson considered herself part of a new department consisting of her and other call center representatives at her call center who receive inbound technical support calls. Defs.' Facts at ¶ 114; Pls.' Resp. at ¶ 114.

From December 2015 until Ms. Johnson's termination in October 2018, she and others in her department used Rockwell, CALI, and Workhub in addition to other programs to receive and handle customer calls. Defs.' Facts at ¶ 115; Pls.' Resp. at ¶ 115.

On-site managers convened team meetings to tell employees about their callback statistics and adherence. Defs.' Facts at ¶ 125; Pls.' Resp. at ¶ 125. Occasionally, Cellco employees voiced

complaints during these team meetings. Defs.' Facts at ¶ 126; Pls.' Resp. at ¶ 126. Ms. Johnson complained to her supervisor during team meetings about instances when she performed uncompensated work during meal breaks or before and after her shift. Defs.' Facts at ¶ 126; Pls.' Resp. at ¶ 126.

Ms. Johnson indicated that on-site managers, who sat at workstations a few feet away from her own, closely monitored her on a daily basis. Defs.' Facts at ¶ 116; Pls.' Resp. at ¶ 116. These managers would instant message her, tap her on the shoulder, and "micromanage" her. Defs.' Facts at ¶ 117; Pls.' Resp. at ¶ 117. Other managers in the call center, such as Ms. Davis, listened to Ms. Johnson's calls from elsewhere in the call center and approached her after the calls to coach her. Defs.' Facts at ¶ 118; Pls.' Resp. at ¶ 118. There were at least 51 documented incidents when on-site managers coached Ms. Johnson and issued reports and warnings concerning her performance. Defs.' Facts at ¶ 122 (A)-(YY); Pls.' Resp. at ¶ 122.

Cellco terminated Ms. Johnson's employment on October 9, 2018. Pls.' Ex. 3, Dep. of Renee Johnson ("Johnson Dep.") at 19:22–20:1, Doc. No. 62-6. On this date, Ms. Johnson's supervisor came to Ms. Johnson's workstation and asked her to sign out of her machine and go into a conference room to meet with the supervisor and Ms. Davis. *Id.* at 20:8–13. Ms. Johnson believes that Ms. Nunez, Isaiah Wiggins, Ms. Davis, and Jim Marzullo made the decision to discharge her. *Id.* at 21:24–22:11. Mr. Wiggins was Ms. Johnson's direct supervisor at Cellco. *Id.* at 22:13–15. Ms. Davis was Mr. Wiggins's boss. *Id.* at 22:16–17. Mr. Marzullo was the director of the call center. *Id.* at 22:23–23:3. They all worked on site at the Rolling Meadows location. *Id.* at 22:18–20. Ms. Davis also contends that Lowell McAdam, the former CEO of VCI, was involved in the decision to fire her because she had filed a complaint that a Verizon store manager had mistreated her son. *Id.* at 210:7–18.

After Cellco terminated Ms. Johnson, she requested a copy of her personnel file by tendering a request to Katherine Grimaldi, who was also on-site at the Rolling Meadows Call Center. Defs.' Facts at ¶ 137; Pls.' Resp. at ¶ 137. Employee records are maintained locally. Defs.' Facts at ¶ 138; Pls.' Resp. at ¶ 138. Ms. Grimaldi mailed a copy of Ms. Johnson's personnel file to her and followed up with an email to confirm Ms. Johnson received it. Defs.' Facts at ¶ 138; Pls.' Resp. at ¶ 138.

## III.    DISCUSSION

### A.    <u>Standard of Review – Motion for Summary Judgment</u>

A district court "shall grant summary judgment if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Additionally, "[s]ummary judgment is appropriate when 'the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law.'" *Wright v. Corning*, 679 F.3d 101, 103 (3d Cir. 2012) (quoting *Orsatti v. N.J. State Police*, 71 F.3d 480, 482 (3d Cir. 1995)). An issue of fact is "genuine" when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" when it "might affect the outcome of the suit under the governing law." *Id.*

The party moving for summary judgment has the initial burden of "informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted). Once the moving party has met this

burden, it is up to the non-moving party to counter with "specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal quotation marks and citation omitted); *see* Fed. R. Civ. P. 56(c) (stating that "[a] party asserting that a fact . . . is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record . . . or . . . showing that the materials cited do not establish the absence. . . of a genuine dispute"). The non-movant must show more than the "mere scintilla of evidence" for elements on which the non-movant bears the burden of production. *Anderson*, 477 U.S. at 252. "[B]are assertions, conclusory allegations, or suspicions" are insufficient to defeat summary judgment. *Fireman's Ins. Co. v. DuFresne*, 676 F.2d 965, 969 (3d Cir. 1982). Additionally, the non-moving party "cannot rely on unsupported allegations, but must go beyond pleadings and provide some evidence that would show that there exists a genuine issue for trial." *Jones v. United Parcel Serv.*, 214 F.3d 402, 407 (3d Cir. 2000). Thus, it is insufficient to "merely [] restat[e] the allegations" in the complaint; instead, the non-moving party must "point to concrete evidence in the record that supports each and every essential element of his case." *Jones v. Beard*, 145 F. App'x 743, 745–46 (3d Cir. 2005) (citing *Celotex*, 477 U.S. at 322). Moreover, arguments made in briefs "are not evidence and cannot by themselves create a factual dispute sufficient to defeat a summary judgment motion." *Jersey Cent. Power & Light Co. v. Twp. of Lacey*, 772 F.2d 1103, 1109–10 (3d Cir. 1985).

"When considering whether there exist genuine issues of material fact, the court is required to examine the evidence of record in the light most favorable to the party opposing summary judgment, and resolve all reasonable inferences in that party's favor." *Wishkin v. Potter*, 476 F.3d 180, 184 (3d Cir. 2007). The court must decide "not whether . . . the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the

evidence presented." *Anderson*, 477 U.S. at 252. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial" and the court should grant summary judgment in favor of the moving party. *Matsushita Elec. Indus. Co.*, 475 U.S. at 587 (citation and internal quotation marks omitted). Nonetheless, when one party's claims are "blatantly contradicted by the record, so that no reasonable jury could believe [them]," the court should not take those claims as true for the "purposes of ruling on a Motion for Summary Judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

## B.   Analysis

The defendants urge the court to dismiss VCI from this lawsuit with prejudice because it was not a joint employer of Ms. Roper, who worked at Verizon Pennsylvania, or Ms. Johnson, who worked at Cellco. The plaintiffs argue that *every* employee at a Verizon subsidiary—be it Verizon Pennsylvania or Cellco—is jointly employed by VCI. Therefore, Ms. Roper and Ms. Johnson are VCI employees, and, further, when Ms. Stufflet made decisions about Ms. Roper's employment at Verizon Pennsylvania or when Ms. Khem made decisions about Ms. Johnson's employment at Cellco, they were VCI employees acting on VCI's behalf.

To resolve this dispute, the court must first look at the language of the FLSA. The FLSA states that "*no employer* shall employ any of his employees . . . for a workweek longer than forty hours unless such employee receives" overtime compensation. 29 U.S.C. § 207(a)(1) (emphasis added).[8] The FLSA defines an "employer" as, *inter alia*, "any person acting directly or indirectly

---

[8] Although this analysis refers only to the FLSA claims, the PMWA and the IMWL contain similar provisions to the FLSA and courts interpreting the statutes interpret them in tandem with the FLSA. *See Sida v. Pintura Constr. LLC*, No. 2:18-cv-806, 2018 WL 6258604, at *1 (W.D. Pa. Nov. 30, 2018) ("The Court will analyze Plaintiff's FLSA and PMWA claims together because the statutes parallel each other in requiring employers to compensate employees for overtime hours worked, and have an identical standard of liability." (citation, internal quotation marks, and alteration omitted)); *Villareal v. El Chile, Inc.*, 776 F. Supp. 2d 778, 784 (N.D. Ill. 2011) ("The FLSA is relevant to plaintiffs' IMWL claims because the IMWL parallels the FLSA, and the same analysis generally applies to both statutes." (citations omitted)). Therefore, though the court does not engage in separate PMWA and IMWL analyses, it applies the FLSA analysis to the PMWA and IMWL claims.

in the interest of an employer in relation to an employee." 29 U.S.C § 203(d). This definition of

an employer is "'expansive[.]'" *In re Enter. Rent-A-Car Wage & Hour Emp. Practices Litig.*

*("Enterprise")*, 683 F.3d 462, 467 (3d Cir. 2012) (quoting *Nationwide Mut. Ins. Co. v. Darden*,

503 U.S. 318, 326 (1992)). The statute's definition of the term "is 'the broadest definition that has

ever been included in any one act.'" *Id.* at 467–68 (quoting *United States v. Rosenwasser*, 323 U.S.

360, 363 n.3 (1945)).

Here, there is no dispute that Verizon Pennsylvania directly employed Ms. Roper and

Cellco directly employed Ms. Johnson. The question remains whether VCI also employed the

plaintiffs as a "joint employer."

Even though the FLSA does not define the term "joint employer," the Third Circuit has

instructed district courts that

> the starting point for the joint employer test should be *N.L.R.B. v. Browning-Ferris Indus. of PA.*, 691 F.2d 1117, 1123 (3d Cir. 1982). We conclude that "where two or more employers exert significant control over the same employees—[whether] from the evidence it can be shown that they share or co-determine those matters governing essential terms and conditions of employment—they constitute 'joint employers'" under the FLSA. *Id.* at 1124; *see also Moldenhauer v. Tazewell-Pekin Consol. Communications Ctr.*, 536 F.3d 640 (7th Cir. 2008). This is consistent with the FLSA regulations regarding joint employment, which state that a joint employment relationship will generally be considered to exist "[w]here the employers are not completely disassociated with respect to the employment of a particular employee and may be deemed to share control of the employee, directly or indirectly, but by reason of the fact that one employer controls, is controlled by, or is under common control with another employer." 29 C.F.R. § 791.2(b). Ultimate control is not necessarily required to find an employer-employee relationship under the FLSA, and even "indirect" control may be sufficient. In other words, the alleged employer must exercise "significant control[.]" *Browning-Ferris*, 691 F.2d at 1124.

*Enterprise*, 683 F.3d at 468. The Third Circuit has also explained that due to "the uniqueness of

the FLSA, a determination of joint employment 'must be based on a consideration of the total

employment situation and the economic realities of the work relationship.'" *Id.* at 469 (quoting

*Bonnette v. Cal. Health & Welfare Agency*, 704 F.2d 1465, 1470 (9th Cir. 1983), *abrogated on other grounds by Garcia v. San Antonio Metro. Transit Auth.*, 469 U.S. 528 (1985)).

With this guidance, the Third Circuit enunciated a four-pronged "test for determining the existence of joint employment under the FLSA." *Id.* at 469. The four prongs of the test ask whether the employer has "(1) authority to hire and fire employees; (2) authority to promulgate work rules and assignments, and set conditions of employment including compensation, benefits, and hours; (3) day-to-day supervision, including employee discipline; and (4) control of employee records including payroll, insurance, taxes, and the like." *Id.* Although these factors "reflect the facts that will generally be most relevant in a joint employment contact," they "*do not constitute an exhaustive list* of all potentially relevant facts and should not be blindly applied."[9] *Id.* (citation and internal quotation marks omitted). Thus, "[i]f a court concludes that other indicia of 'significant control' are present to suggest that a given employer was a joint employer of an employee, that determination may be persuasive, when incorporated with the [four factors]."[10] *Id.* at 470.

The parties agree that the court should apply the *Enterprise* test here. *See* Defs.' Mem. of Law in Supp. of Mot. for Summ. J. as to the Issue of Jt. Employer ("Defs.' Mem.") at 10–31, Doc. No. 44 (referencing *Enterprise* test and arguing that factual record shows no genuine issue of fact that plaintiffs have not satisfied test); Pls.' Mem. in Opp'n to Defs.' Mot. for Summ. J. on the Issue of Verizon Comm'ns, Inc.'s Status as a Jt. Employer ("Pls.' Opp'n Mem.") at 4, 14–24, Doc. No. 62-3 (referencing *Enterprise* test and arguing that factual record shows numerous genuine issues

---

[9] The Third Circuit also "ma[d]e clear" that the factors set forth to determine whether an entity is an employer set forth in *Lewis v. Vollmer of America*, No. 05-1632, 2008 WL 355607 (W.D. Pa. Feb. 7, 2008) "provide a useful analytical framework and may generally serve as the starting point for a district court's analysis, as they did here, especially in the parent-subsidiary context." *Enterprise*, 683 F.3d at 469.
[10] In addition, "[t]he mere existence of some disputed fact will not result in the denial of a summary judgment motion— nor need the District Court decide that *every* factor weighs against joint employment." *Enterprise*, 683 F.3d at 467.

of material fact that VCI is joint employer of plaintiffs). As the disposition of the instant motion

turns on the court's analysis of the *Enterprise* factors, the court will address each factor in turn.[11]

---

[11] The defendants include two references in their initial memorandum to the court that require brief discussion. The first of these references is an argument that "[t]here is a [p]resumption [a]gainst [j]oint-[e]mployer [l]iability." Defs.' Mem. at 6 (emphasis omitted). The court notes that it is unclear whether the defendants are attempting to make an argument this broad, as none of the cases they cite in support of the argument actually state it and the Third Circuit has acknowledged that the FLSA's definition of "employer" is very broad. Instead of supporting such a broad presumption, the cases the defendants reference relate to (1) the general proposition that a parent corporation is generally not liable for the acts of its subsidiary and (2) a presumption that a parent corporation is not an employer of an employee of the subsidiary. *See id.* (citing *Jean Anderson Hierarchy of Agents v. Allstate Ins. Co.*, 2 F. Supp. 2d 688, 691 (E.D. Pa. 1998) and *Martin v. Safeguard Scientifics, Inc.*, 17 F. Supp. 2d 357, 363 (E.D. Pa. 1998)).

   While the defendants appear to accurately state the law with respect to the two statements of the law, it is unclear how applicable these legal principles are to this FLSA matter. The plaintiffs are not arguing that VCI is a joint employer under the FLSA simply because it owns Verizon Pennsylvania and Cellco; instead, they assert that this ownership is one of the facts in the record that demonstrate joint employment. The plaintiffs could not assert such an argument because such a claim would completely disregard the *Enterprise* test and allow for a finding of a joint employer relationship based solely on a parent corporation wholly owning a subsidiary.

   As for the presumption against finding a parent corporation to be an employer of a subsidiary's employees, while there are a few district court cases referencing this presumption in FLSA cases, the majority of district courts referencing it have done so in the employment discrimination context. *Compare Attanasio v. Cmty. Health Sys., Inc.*, 863 F. Supp. 2d 417, 422 (M.D. Pa. 2012) (explaining that while "FLSA liability can be shared between a parent corporation and its subsidiary," "the doctrine of limited liability creates a strong presumption that a parent corporation is not the employer of its subsidiary's employees, and only evidence of control suggesting a significant departure from the ordinary relationship between a parent and its subsidiary is sufficient to establish a joint employer relationship" (citation, alterations, and internal quotation marks omitted)), *with Martin v. Safeguard Scientifics, Inc.*, 17 F. Supp. 2d 357, 363 (E.D. Pa. 1998) (addressing "under what circumstances might a majority equity holder be held liable under Title VII, for the discriminatory acts of the corporation in which it holds stock" and explaining that "[t]here is a strong presumption that a parent is not the employer of its subsidiary's employees" and "the courts have found parent corporations to be employers only in extraordinary circumstances" (citations and internal quotation marks omitted)). In the FLSA context, all of the decisions appear to have been entered prior to *Enterprise*, and interestingly, although the Third Circuit seemingly had the opportunity to announce such a presumption in that case insofar as the district court referenced it in its opinion granting summary judgment, the court did not do so. *See In re Enterprise Rent-A-Car Wage & Hour Emp. Pracs. Litig.*, 735 F. Supp. 2d 277, 338 (W.D. Pa. 2010) ("The doctrine of limited liability creates a strong presumption that a parent corporation is not the employer of its subsidiary's employees[.]" (quoting *Lusk v. Foxmeyer Health Corp.*, 129 F.3d 773, 778 (5th Cir. 1997))), *aff'd*, 683 F.3d 462 (3d Cir. 2012). At bottom, it is unclear whether a presumption against finding a parent corporation a joint employer of a subsidiary's employee, exists in FLSA cases in the Third Circuit after *Enterprise*. *Cf. Darden*, 503 U.S. at 326 (explaining that FLSA's definition of "employee," has "striking breadth" and "stretches the meaning of 'employee' to cover some parties who might not qualify as such under a strict application of traditional agency law principles").

   The second reference is the defendants' "important note that federal district courts have already determined that VCI is not a joint employer of individuals *directly employed* by revenue-generating operating subsidiaries via which it conducts business, including in wage and hour disputes." Defs.' Mem. at 7. In support of this statement, the defendants cite to two cases: *Byard v. Verizon West Virginia Inc.*, Civ. A. No. 1:11CV132, 2012 WL 1085775 (N.D. W. Va. Mar. 30, 2012) and *Smith v. Verizon Washington, DC*, Civ. No. PJM 11-1301, 2011 WL 5547996 (D. Md. Nov. 10, 2011), *see id.* at 7–8. Unfortunately, neither case is particularly helpful because, as discussed below, they do not involve application of the *Enterprise* test, *Smith* was an employment discrimination suit, the district courts in both cases were resolving motions to dismiss, and, while *Byard* involved a state-law claim for the failure to pay all wages for hours worked, the district court ultimately dismissed VCI for lack of personal jurisdiction.

   In *Smith*, the defendants, which included VCI, moved to have the District of Maryland dismiss a *pro se* plaintiff's claims of employment discrimination. 2011 WL 5547996, at *1. VCI argued that the plaintiff insufficiently pleaded that it was the plaintiff's employer and it had submitted a declaration that one of its subsidiaries, Verizon DC, was his actual employer. *Id.* at *3. The district court, after noting the strong presumption against finding a parent

### 1.     Applying *Enterprise*: Hiring and Firing

The first *Enterprise* factor concerns whether the alleged joint employer has the "authority to hire and fire employees." 683 F.3d at 469. Before evaluating whether the facts of record demonstrate that VCI has the authority to hire and fire employees like the plaintiffs, the court must resolve a dispute that permeates the parties' arguments on this factor (and, actually, the remaining three factors), namely, is it enough for a parent company to merely *possess* the authority to hire and fire employees, or must the parent company actually *use* this authority to constitute a joint employer? *Compare* Pls.' Opp'n Mem. at 15 ("VCI's argument mis-applies the *In re Enterprise* test and misses the point" because the test "does not ask if the company alleged to be a joint employer <u>actually hired or fired a specific employee</u>; instead it asks if the company has the <u>authority to hire and fire</u>."), *and id.* at 19 ("The third *In re Enterprise* prong does not ask if a company alleged to be a joint <u>employer actually supervised or disciplined a specific employee</u>, but if the company <u>has the authority to supervise or discipline</u>."), *with* Defs.' Mem. at 11 ("VCI directors, officers and employees have never been involved in the hiring and firing of call-center representatives directly employed by Verizon Pennsylvania."), *and* Defs.' Reply Mem. of Law in

---

company to be an employer of a subsidiary's employee, dismissed with prejudice the plaintiff's claims against VCI because the plaintiff "alleges neither that VCI "control[s] the employment practices of the subsidiary, nor that it so dominate[s] the subsidiary's operations that the parent and the subsidiary are one entity and thus one employer." *Id.* (citation and internal quotation marks omitted). Although the court dismissed VCI from this litigation, this decision has no use here because it was an employment discrimination suit (and, thus, did not address whether VCI falls under the FLSA's definition of "employer") and the district court did not have to analyze a factual record; instead, the court was limited to primarily reviewing a complaint which was "devoid of material factual allegations." *Id.* at *1.

As for *Byard*, the plaintiffs there had sued multiple defendants, including VCI, for violating West Virginia's Wage Payment and Collection Act because they allegedly "failed to fully compensate [them] and a class of current and former employees for their 'time worked' at the Verizon call centers located in Charleston and Clarksburg, West Virginia." 2012 WL 1085775, at *1. VCI moved to dismiss the case against it for lack of personal jurisdiction. *See id.* at *1, 7. Although the district court did not hold a hearing, the court thoroughly reviewed the written record the parties provided and determined that the court lacked general or specific personal jurisdiction over VCI. *See id.* at *7–14. In analyzing the parties' jurisdictional arguments, the court addressed some claims and arguments similar to those asserted here, such as whether VCI's code of conduct showed it exercised sufficient control over its subsidiaries and whether VCI was a joint employer with its West Virginia subsidiary. *Id.* at *12, 13–14. Nonetheless, this court will not rely on this decision because the personal jurisdiction considerations are different than those present here, and the court's joint employer analysis did not involve a review of the *Enterprise* factors.

Supp. of Mot. for Summ. J. as to the Issue of Jt. Employer ("Defs.' Reply Mem.") at 5, Doc. No. 63 ("[E]ven assuming VCI had authority to hire and fire a subsidiary's employees, all the specific evidence related to Roper, Johnson and other call-center employees demonstrates that VCI never exercised such authority."), *and* Defs.' Reply Mem. at 8 ("Plaintiffs are wrong about the law, as the Third Circuit was not concerned with authority in this third element.").

The parties have not identified, and this court has not located, any decision in this circuit specifically addressing this particular issue. The Third Circuit does not appear to address it in the *Enterprise* decision. Nonetheless, it appears that a fair reading of the opinion warrants the conclusion that, with regard to the first two factors, the Third Circuit does not require that the proposed joint employer actually exercise any authority.

As noted by the plaintiffs, the first two *Enterprise* factors reference "the alleged employer's *authority*" to "hire and fire the relevant employees," "promulgate work rules and assignments," and "set the employees' conditions of employment: compensation, benefits, and work schedules." 683 F.3d at 469. The last two factors do not mention the alleged employer's authority at all; instead, they look at what the alleged employer actually did – whether the employer was involved in the "day-to-day employee supervision, including employee discipline" and whether the alleged employer "actual[ly] control[led] . . . employee records, such as payroll, insurance, or taxes." *Id.* It would be erroneous for this court to find that the Third Circuit intended anything other than what the court said in delineating the four factors. Thus, the first two require a district court to examine the alleged employer's authority, whereas the last two factors require the court to review what the alleged employer actually did. *Id.*

In support of the defendants' contention that the first two factors require this court to evaluate whether VCI actually exercised any purported authority, they focus on a footnote in

*Enterprise. See* Defs.' Reply Mem. at 5 (citing *Enterprise*, 683 F.3d at 471 n.10. In this footnote, the Third Circuit indicated that

> [the Honorable D. Brooks Smith][12] is of the view that while Enterprise Holdings, Inc. has the legal authority to hire, fire, set assignments, etc., which bears on the first two factors of the *Enterprise* test, given the complete absence of exercised control, this legal authority is insufficient to confer joint-employer status as a matter of law."

*Enterprise*, 683 F.3d at 471 n.10. As evidenced by the language of the footnote, this view is attributed to only Chief Judge Smith and not to the other two judges on the panel. *Id.*

Although the defendants cite to this footnote in support of their argument, the footnote appears to contradict the argument because the Third Circuit did not include the view in the enumerated *Enterprise* factors and attributed the view only to Chief Judge Smith. It is therefore not overtly part of the Third Circuit's determination as the defendants suggest. If the Third Circuit had intended for the court to examine whether an alleged joint employer actually exercised authority in all instances, the court could just have directed district courts to examine, for example, whether the alleged joint employer actually hired and fired.

Nevertheless, instances of an alleged joint employer actually exercising control are not necessarily irrelevant to the court's inquiry because, for example, if an alleged joint employer disputes having authority to hire and fire, instances of the alleged joint employer actually hiring or firing would lend support to a finding (or at least potentially create a genuine issue of material fact in the summary judgment context) that the alleged joint employer had the authority to hire and fire. Conversely, a lack of instances of hiring and firing could be relevant to buttressing an argument of a lack of control. In addition, even if VCI's exercise of control is unnecessary in itself with regard to the first or second *Enterprise* factor, it would seemingly be relevant to "the total

---

[12] Judge Smith is the current Chief Judge of the Third Circuit.

employment situation and the economic realities of the work relationship." *Id.* at 469 (citation and internal quotation marks omitted).[13]

Turning now to analyzing the first *Enterprise* factor with the facts of record in this case, the court notes that the undisputed evidence in the record shows that hiring and firing at Verizon Pennsylvania happens locally. At Verizon Pennsylvania, on-site call center managers conduct in-person candidate interviews at the call centers where the prospective applicants would work. Defs.' Facts at ¶ 31; Pls.' Resp. at ¶ 31. Verizon Pennsylvania managers dictate whether applicants should receive an offer or a rejection. Defs.' Facts at ¶ 31; Pls.' Resp. at ¶ 31. There is no evidence to demonstrate that any of the VCI directors or officers actually engage in any way in the hiring process.

As for firing at Verizon Pennsylvania, Verizon Pennsylvania managers must comply with the collective bargaining agreement when disciplining or terminating an employee. If Verizon Pennsylvania engages in layoffs, the collective bargaining agreement dictates the sequence in which Verizon Pennsylvania must conduct those layoffs. Defs.' Facts at ¶ 35; Pls.' Resp. at ¶ 35. Unless Verizon Pennsylvania conducts layoffs, Verizon Pennsylvania can only dismiss call center representatives for cause under Article 12 of the collective bargaining agreement. Defs.' Facts at ¶ 35; Pls.' Resp. at ¶ 35.

---

[13] The Department of Labor issued a new final rule which took effect in March 2020. *See* 29 C.F.R. § 791.2(a)(1) (2020). This final rule "narrow[ed] the definition of joint employment under the FLSA." *New York v. Scalia*, Civ. A. No. 1:20-cv-1689-GHW, 2020 WL 5370871, at *1, 4 (S.D.N.Y. Sept. 8, 2020). In doing so, it adopts a four-factor balancing test to evaluate whether the alleged joint employer "(i) [h]ires or fires the employee; (ii) [s]upervises and controls the employee's work schedule or conditions of employment to a substantial degree; (iii) [d]etermines the employee's rate and method of payment; and (iv) [m]aintains the employee's employment records." 29 C.F.R. § 791.2(a)(1)(i)-(iv). "The appropriate weight to give each factor will vary depending on the circumstances of how that factor does or does not suggest control in the particular case." *Id.* § 791.2(3)(i).

A group of 18 states challenged this new final rule and the United States District Court for the Southern District of New York concluded that "[t]he Department[ of Labor's] novel interpretation for vertical joint employer liability conflicts with the FLSA and is arbitrary and capricious." *Scalia*, 2020 WL 5370871 at *34. The district court then severed the vertical joint employer portion from the remainder of the regulation. *Id.*

The defendants have appealed from that decision, with the appeal currently pending in the Second Circuit Court of Appeals. *See New York v. Scalia*, No. 20-3806 (2d Cir.).

With regard to Cellco, hiring and firing happens locally there as well. As already indicated, Ms. Davis was the highest-level manager in the Tech Support Cue at the Rolling Meadows site when Ms. Johnson worked there. Davis Decl. at ¶¶ 3–4. Ms. Davis hired, coached, counseled, and fired tech experts in the Tech Support Cue. *Id.* at ¶ 10. When hiring for supervisor roles, she consulted with other Verizon Wireless Senior Managers at the Rolling Meadows Call centers, but she claims she "never consulted with any officers, directors, or employees of VCI or Verizon Pennsylvania in connection with [her] hiring decision." *Id.* at ¶ 14. She further explains "[n]o officers, directors, or employees of VCI . . . have the authority to hire, discipline or dismiss [Cellco] call center employees. Those decisions are made locally by [Cellco] managers[.]" *Id.* at ¶ 17.

Ms. Johnson's experience at Cellco was no different than the general process for Cellco's local hiring and firing.[14] When Cellco terminated Ms. Johnson's employment in October 2018, local (on-site) Cellco employees were involved and made the decision to discharge her. Johnson Dep. at 19:22–23:3. None of these individuals were executives of VCI or VCI officers.

Although hiring and firing occurred locally at Cellco and Verizon Pennsylvania, and without direct involvement by VCI, the plaintiffs argue that VCI was still involved in the hiring and termination process at Cellco and Verizon Wireless. Pls.' Mem. at 16. For Verizon Pennsylvania, the plaintiffs provide no evidence to demonstrate that VCI executives or officers are or were involved in any firing decisions at Verizon Pennsylvania. Instead, they argue that the Verizon Labor Relations Department was involved and individuals in that department are VCI

---

[14] Courts typically examine the alleged joint employer's hiring and firing capabilities in relation to the plaintiff. *See e.g.*, *Orozco v. Plackis*, 757 F.3d 445, 449 (5th Cir. 2014) ("To satisfy the first element . . , Orzoco had to present evidence that Plackis possessed the power to hire and fire *him*.") (emphasis added); *Keating v. Pittston City Hous. Auth.*, 3:17-CV-465, 2018 WL 1414459, at *5 (M.D. Pa. Mar. 21, 2018) ("As implicitly state in both the *Enterprise* test and the FMLA regulations, a joint employment relationship is specific to an individual employee.").

employees; they point to Ms. Roper's deposition testimony that VCI was involved in her discipline; and they generally assert that of course VCI was involved because all employees at Verizon Pennsylvania (and any other VCI subsidiary) is an employee at VCI.

The plaintiffs first contend that "[t]o the extent any V-Team members belong to a union, or benefit from the terms of a collective bargaining agreement, all of these agreements are directly authorized and approved by the 'Verizon' Labor Relations Department," Pls.' Opp'n Mem. at 11, which "is obviously made up of VCI employees." Pls.' Resp. at ¶ 24. The plaintiffs base this argument on Ms. Glennon's deposition, where she testified that the "Verizon labor relations department" is "responsible, to [her] knowledge, for all collective bargaining agreements applying to the 'V Team.'" Glennon Dep. at 61:15–63:4. However, this portion of Ms. Glennon's testimony does not create a genuine issue of material fact as to who negotiates the collective bargaining agreement, because, when asked "what company owns [the Verizon labor relations department] or runs it," Ms. Glennon indicated she did not know. *Id.* at 62:16–24. The plaintiffs provide no evidence to indicate VCI owns and operates the labor relations department.[15]

The plaintiffs' second contention relates to Ms. Roper's assertion that VCI was involved in her 2014 discipline. In this regard, Ms. Roper testified during her deposition that "the company [went] after her in June 2014" and the decision to go after an individual stems from "VCI, the company. It comes from the top." Pls.' Ex. 4, Dep. of Angela Roper at 147:18–148:6, Doc. No. 62-7. Despite this belief, Ms. Roper readily admits she does not "have any proof" VCI is involved in these decisions, rather this is "just what [she] believe[s] because there's no individual reason

---

[15] With their reply memorandum, the defendants submitted a supplemental declaration of Angelia M. Sposa, the "Director [of] Labor Relations," who "administers the . . . [CBA] between Verizon Pennsylvania and the Communications Workers of America, AFL-CIO and its Local 13500 . . . ." Defs.' Reply Mem, Ex. 41, Suppl. Decl. of Angelia M. Sposa at ¶ 5, Doc. No. 63-1. Although she does not identify her employer, she declares that she is "not an employee of Verizon Communications, Inc., nor are any members of my team employees of Verizon Communications, Inc." *Id.* at ¶ 6.

why managers do that. Like you could be really close with them one day, and the next day out of

nowhere they just come for you." *Id.* at 148:9–13. Without proof, Ms. Roper's subjective belief is

insufficient to show that VCI was involved in her discipline. *See Ecoquij-Tzep v. Hawaiian Grill*,

No. 3:16-CV-625-BN, 2017 WL 2666154, at *6 (N.D. Tex. June 21, 2017) (explaining that

"subjective beliefs of the alleged employee or employer are irrelevant to a worker's status"); *see*

*also Hopkins v. Cornerstone Am.*, 545 F.3d 338, 346 (5th Cir. 2008) ("Subjective beliefs cannot

transmogrify objective economic realities." (quoting *Brock v. Mr. W Fireworks, Inc.*, 814 F.2d

1042, 1049 (5th Cir. 1987)).

The plaintiffs' final contention is that VCI jointly employs every single employee at

Verizon Pennsylvania (and Cellco for that matter), and, therefore, when on-site managers make

hiring and firing decisions at subsidiaries, they do so as employees of VCI. This argument

undergirds the plaintiffs' arguments in each of the four prongs of the *Enterprise* analysis. *See, e.g.*,

Pls.' Resp. at ¶ 2 ("A genuine dispute exists as to this fact. Defendants assert the VCI employs

only a handful of people. That is not correct. . . . All 144,000-plus "Verizon" employees are VCI's

employees (emphasis omitted) (internal quotation marks and internal citations omitted)); *id.* at ¶ 24

(contending that VCI's Labor Relations Department "is obviously made up of VCI employees");

*id.* at ¶ 32 (referencing "V-Team members employed by VCI"); *id.* at ¶ 96 ("Defendants assert that

Ms. Stufflet made a decision to suspend Roper locally without input from any employees of VCI.

However, the cited section . . . states . . . [they] likely consulted with . . . a labor relations

manager" and "VCI controls the Verizon Labor Relations Department" (internal quotation marks

omitted)).

An apparent foundation for the plaintiffs' assertion lies in (1) VCI's 2018 10-K, which

states, *inter alia*, "[w]e have a highly diverse workforce of approximately 144,500 employees"

and (2) Verizon's 2018 Annual Report where the then-CEO described Verizon employees on the "V Team" as "our employees." Pl.'s Statement of Genuine Issues at ¶ 12, Doc. No. 62-2. With regard to the 2018 10-K, while it contains the above-referenced statement, it also states in a section specifically pertaining to "Employees," that "[a]s of December 31, 2018, Verizon *and its subsidiaries* had approximately 144,500 employees." 2018 10-K at ECF p. 7 (emphasis added). This statement provided more detail regarding the number of employees referenced elsewhere in the 2018 10-K, and mitigates against a finding that VCI was claiming that all approximately 144,500 employees are its employees.

Regardless, even if VCI did not have this additional, clarifying statement in its 2018 10-K, all approximately 144,500 Verizon employees—*i.e.*, the "V Team"—are not automatically VCI employees. In *Enterprise*, "[t]he Enterprise website d[id] not draw any distinction between Enterprise Holdings, Inc. or its 38 subsidiaries, and represent[ed] that 'Enterprise Rent-a-Car' has a fleet of nearly 900,000 rental vehicles, 64,000 employees, and 6,900 offices throughout the world." *Enterprise*, 683 F.3d at 465 n.8. "In addition, Enterprise Holdings, Inc. ha[d] a human resources department, which provide[d] certain services to subsidiaries, including, among other things, job descriptions, best practices, and compensation guides." *Id.* at 466. "The human resources department also negotiate[d] health plans which are offered to employees of Enterprise Holdings, Inc. and to employees of subsidiaries." *Id.* Despite this convergence among Enterprise's subsidiaries—which Enterprise Holdings, Inc. ushered in—the Third Circuit still determined that Enterprise Holdings, Inc. was not a joint employer.

This court renders a similar conclusion. The ten employees listed on VCI's SEC filings are undoubtedly employees of VCI. 2018 10-K at ECF p. 8. The plaintiffs have not produced sufficient evidence to demonstrate a genuine issue of material fact that the managers and supervisors at the

35

subsidiaries are employees of VCI. Because of this lack of evidence, there is no triable issue of material fact that when local managers made on-site decisions about Ms. Roper's employment, they did so as employees of VCI.

The court also notes that, with regard to Cellco, the plaintiffs provide no evidence to demonstrate that VCI executives or officers are involved in any firing decisions at Cellco. The plaintiffs claim that VCI's former CEO, Lowell McAdam was involved in the decision to terminate Ms. Johnson. Pls.' Opp'n Mem. at 16. However, as with Ms. Roper, "subjective beliefs of the alleged employee or employer are irrelevant to a worker's status." *Ecoquij-Tzep*, 2017 WL 2666154, at \*6. Further, when asked if she thought VCI "was involved in the discreet [sic] decision to discharge [her] for performance" Ms. Johnson responded, "I don't know that answer." Johnson Dep. at 209:22–25. She went on to explain that she thought Lowell McAdam might have been involved because she "had told HR, Katherine Grimaldi . . . that [she] had sent a customer complaint through Chad one of [Cellco's] indirect dealers about . . . one of the store managers that had mistreated a customer, which happened to be [her] son." *Id.* at 210:12–18. However, such conjecture is insufficient to demonstrate there is an issue of triable fact as to whether Lowell McAdam was actually involved in Ms. Johnson's termination. *See Bleistine v. Diocese of Trenton*, 914 F. Supp. 2d 628, 637 (D.N.J. 2012) ("The Court must make factual inferences in the Plaintiff's favor, but 'it is insufficient for the party opposing a motion for summary judgment to rely upon suppositions, conjecture or to assert that an issue may arise at a future date.'" (quoting *U.S. ex rel. Sacks v. Philadelphia Health Mgmt. Corp.*, 519 F. Supp. 818, 823 (E.D. Pa. 1981))).

In addition to the arguments about how VCI was actually involved in hiring and firing at Verizon Pennsylvania and Cellco, the plaintiffs assert that other facts in the record support a finding that VCI had authority to hire and fire at these subsidiaries. In this regard, the plaintiffs

argue that "VCI plainly has authority to hire and fire Verizon employees" because it (1) owns Cellco and Verizon Pennsylvania, (2) controls all of Verizon's business actions and operations, (3) "sets the business strategy that determines when call centers are opened or closed," (4) distributes job descriptions used to (a) evaluate applicants to work at the call centers and (b) make individual hiring decisions, (5) promulgates policies in its Code of Conduct which supervisors and managers use to assess individual employment decisions, and (6) VCI has a reservation of rights in its Code of Conduct which would allow it to terminate any employee without cause or notice (subject to any legal and contractual limitations). Pls.' Mem. at 15–16. As discussed below, none of these facts are sufficient to show VCI had authority to hire and fire the plaintiffs (or other similarly situated call-center employees).

With regard to the plaintiffs' first and second contentions, although the record supports the assertion (and it is undisputed by the defendants) that VCI owns Verizon Pennsylvania and Cellco, the record does not show that VCI "controls all of 'Verizon's' business actions and operations," *id.* at 15, which would conceivably include hiring and firing.[16] If sole ownership could demonstrate the type of authority that would satisfy this first *Enterprise* factor, surely the Third Circuit would have said so as *Enterprise* also involved a parent corporation and its wholly-owned 38 subsidiaries, all of which had the same three people—the parent corporation's chief executive officer, president and chief operating officer, and chief financial officer—serving on their boards of directors. 683 F.3d at 466. At bottom, the plaintiffs' reference to VCI's ownership and the extent to which it has

---

[16] The plaintiffs' citation to paragraphs one and four of their statement of genuine issues and the sources cited therein also do not support this statement. It appears that the plaintiffs possibly meant to reference paragraph five of their genuine issues, where they state that "VCI's SEC filings represent that it is responsible for all of 'Verizon's' actions," but neither this statement nor the cited material supports a finding that VCI controlled all of the subsidiaries to the point where it had the authority to hire and fire.

control over any subsidiary is a product of the normal operations of a parent corporation and its subsidiary and is not a fact that shows authority to hire and fire.

As for the plaintiffs' third factual assertion in support of a finding of authority to hire and fire, *i.e.* that VCI sets the business strategy which determines when call centers are opened or closed and that this is the time when employees are hired and fired, they include no argument as how this would lead the court to conclude that VCI had authority to hire and fire. Even if VCI actually selected the hours during which the call centers were opened, and if all interviews with prospective employees and terminations of current employees occurred during those hours, VCI's role in setting the hours has nothing to do with any actual authority to hire and fire and does not even create a remote inference in support of VCI's authority in this area.

Similarly, the plaintiffs' reference to VCI's purported role in distributing job descriptions used to evaluate call center applicants or in promulgating policies in the Code of Conduct that influence supervisors and managers when making employment decisions does not have any bearing on whether VCI had authority to hire and fire.[17] The plaintiffs have not suggested that these job descriptions provide mandatory guidance that the hiring managers in the subsidiaries have to follow. Even if VCI drafted the job descriptions and even if the Code of Conduct influenced supervisors and managers when making employment decisions, that does not establish that VCI had authority to hire and fire its subsidiaries' employees.

The plaintiffs' final reference to a fact in the record that supports their argument about authority to hire and fire is a provision in the Code of Conduct which states: "Employment with

---

[17] Part of the plaintiffs' argument here is based on the fact that the managers and supervisors, due to their role on the V Team, are actually VCI employees and acting as agents on VCI's behalf. The court has already rejected this contention.

The court also notes that VCI's role in creating job descriptions is based on the Verizon website and a printed job description, *see* Pls.' Resp. at ¶ 26, and it is unclear that VCI is the entity that prepared the job descriptions.

Verizon is 'at will,' which means that you or Verizon may terminate your employment at any time, with or without cause, with or without notice, for any reason not prohibited by law, unless governed by a collective bargaining agreement or specific contract of employment." VCI Code of Conduct at ECF p. 10 (emphasis omitted); Pls.' Mem. at 16. This provision also does not support a finding of authority because there is no definition in the Code of Conduct to the meaning of "Verizon." The plaintiffs would have the court determine that "Verizon" means VCI and this provision means that VCI could terminate the employment of a subsidiary's employee for a violation of the Code of Conduct. Nonetheless, even if this is a reasonable interpretation of this language in the Code of Conduct, there is no evidence in the record that VCI actually acted in accordance with this provision toward the plaintiffs or any other employee of a subsidiary. *See Enterprise*, 683 F.3d at 471 (explaining that the court's determination that parent corporation was not employer of subsidiaries' assistant managers was "bolstered by the readily apparent fact that [parent corporation] exercised *no* control, let alone *significant* control, over the assistant managers").[18]

Based on the foregoing, the court finds that the first factor weighs in favor of VCI.

## 2. Applying *Enterprise*: The Authority to Promulgate Work Rules and Assignments, and Set Conditions of Employment Including Compensation, Benefits, and Hours

With regard to the second *Enterprise* factor, the plaintiffs argue that VCI promulgated work rules in a variety of ways. These ways included the Verizon Code of Conduct "which provided most, if not all, of [the plaintiffs'] work rules and conditions of employment"; "providing [the

---

[18] The court also notes that Verizon's unified corporate branding and policies across its subsidiaries does not equate to joint employer status. "Courts have found that common marketing image, common branding, common email domain, and joint use of trademark logs, fail to render entities" joint employers "if they maintain completely separate day-to-day activities." *Horowitz v. AT&T, Inc.*, Civil Action No. 3:17-cv-4827, 2018 WL 1942525, at *13 (D.N.J. April 25, 2018). For example, in *Horowitz*, the district court found that the fact that AT&T shared "employment policies and codes of ethics" and portrayed itself and its subsidiaries "as a single brand and to the public as the 'AT&T family of companies,'" there still was not sufficient evidence to determine that AT&T was a joint employer of the employees. *Id.*

plaintiffs'] work schedules on the same NICE IEX scheduling system"; "requiring [the plaintiffs']
to track their work time on the same V[Z]-Time timekeeping system"; "setting adherence
standards, monitoring employees' adherence rates on a daily basis and using these rates to assess
their job performance and compensation"; "setting 'callback' standards, monitoring employees'
callback rates on a daily basis and using these to assess their job performance and compensation";
"setting dozens of performance metrics used to monitor and assess employees' job performance
and determine their compensation"; and providing benefits. Pls.' Opp'n Mem. at 10, 17–19.

        The defendants argue that the plaintiffs present no evidence to demonstrate that VCI
enforced compliance with the Code, because on-site managers enforce the Code. Defs.' Reply
Mem. at 7. Additionally, the defendants argue "Plaintiffs say nothing about compensation, benefits
and hours because they have no bases to argue that VCI is involved in setting any of those." Defs.'
Reply Mem. at 7.

        The court first addresses the Code of Conduct before examining how "providing [the
plaintiffs'] work schedules on the same NICE IEX scheduling system"; "requiring [the plaintiffs']
to track their work time on the same V[Z]-Time timekeeping system"; "setting adherence
standards, monitoring employees' adherence rates on a daily basis and using these rates to assess
their job performance and compensation"; "setting 'callback' standards, monitoring employees'
callback rates on a daily basis and using these to assess their job performance and compensation";
"setting dozens of performance metrics used to monitor and assess employees' job performance
and determine their compensation"; and providing benefits impacts VCI's alleged joint employer
status. Pls.' Opp'n Mem. at 17–19, 10.

a.    The Code of Conduct

Verizon's 40-page Code of Conduct covers a wide swath of behavior. It has four broad chapters: (1) "Maintaining an Inclusive, Fair and Healthy Work Environment"; (2) Maintaining Integrity and Fairness in the Workplace"; (3) "Protecting Verizon's Assets and Reputation"; and (4) "Maintaining Integrity and Fairness in the Marketplace." Code of Conduct at ECF pp. 5–7. VCI was clearly involved in writing the Code, given that the Code includes a letter from VCI's then-CEO, Lowell McAdam, who writes "I know I can count on you to put integrity and ethical business practices at the center of what you do." *Id.* at ECF p. 4.

The Verizon Code of Conduct is mandatory for all Verizon employees. The Code warns that "[v]iolations of the law, the Code and other company policies, procedures, instructions, practices and the like can lead to disciplinary action up to and including termination of employment." *Id.* at ECF p. 36. The Code warns that "[s]uch disciplinary action may also be taken against supervisors or executives who condone, permit or have knowledge of improper conduct or fail to take action to prevent and detect violations, such as failure to provide training and failure to supervise subordinates' work." *Id.* Despite the mandatory nature of the Code, to the extent that on-site managers have the discretion to deploy the Code in the manner they see fit, there is an exception to any discretion afforded to on-site managers. In this regard, the Code explicitly states an employee "may never violate this Code or any company policy even if a supervisor directs [the employee] to do so." Code of Conduct at ECF p. 8. If a manager directs an employee to violate the Code, the Code dictates the employee "should advise [the] supervisor that the request violates the Code" and if the "supervisor refuses to modify his or her request, [the employee] should contact the VZ Compliance Guideline immediately."[19] *Id.*

---

[19] The Code provides a link to the VZ Compliance Guideline. Code of Conduct at ECF p. 9. The link explains "[t]he VZ Compliance Guideline is our confidential global compliance hotline, available 24/7 to anyone who want [sic] to

VCI's Code of Conduct is surely indicative of joint employer status. The court need not look any further than *Enterprise* in reaching this determination. In *Enterprise*, the Third Circuit rejected the plaintiffs' contention that the parent corporation's guidelines and manuals showed it had authority "over the conditions of the assistant managers' employment" because the parent's "*suggested* policies and practices was entirely discretionary on the part of the subsidiaries." 683 F.3d at 471.

Unlike in *Enterprise*, VCI has mandatory work rules here that must be followed by all members of the V Team to remain employed. There is no evidence in the record that they are discretionary or suggestions. Thus, this appears to be the type of indirect control referenced in *Enterprise* because VCI has the authority and has used the authority to adopt work rules that V Team members must follow.[20]

b.        Other Commonalities Across Subsidiaries

There is a good deal of overlap in the way business functions at Verizon Pennsylvania and Cellco. The overlap is seemingly attributable to Verizon-wide policies and procedures. The court reviews these policies and procedures to examine whether they amount to evidence that VCI had authority over other conditions of the plaintiffs' work.

---

ask questions, seek guidance and report concerns about ethics, compliance or our Code of Conduct." *VZ Compliance Guideline*, https://secure.ethicspoint.com/domain/media/en/gui/60616/index.html. The link also explains that   the Compliance Guideline "is administered by an independent company (NAVEX Global)." *Id.* NAVEX Global "makes [employees'] reports [of Code violations] available only to specific individuals within Verizon who are charged with evaluating the report, based on the type of violation and location of the incident." *Common Questions and Answers for Employees*, NAVEX GLOBAL https://secure.ethicspoint.com/domain/media/en/gui/60616/faq.pdf.

[20] The court recognizes that other district courts have addressed codes of conduct and determined that they are not indicative of joint employer status. For example, in *In re Jimmy John's Overtime Litigation ("Jimmy John's")*, a group of corporate entities moved for summary judgment on the basis that they were not the joint employer of employees of their franchisees for purposes of the employees' FLSA claims. No. 14 C 5509, 2018 WL 3231273, at *1 (N.D. Ill. June 14, 2018). The plaintiffs claimed that the franchisor's operations manual, "which encompass[ed] subjects such as Operations, Advertising, Financial and Accounting, and Services," showed the franchisor was their joint employer. *See id.* at *5–6, 14–17, 19–21. Despite the heavy-handed nature of the manual, the court concluded that "Jimmy John's guidance does not amount to actual control over franchise employment, which has been established to be in the managers' control." *Id.* at *16.

i.     *NICE IEX, VZ-Timekeeping System, and Other Software*

Call center representatives at Cellco and Verizon Pennsylvania received their schedules via IEX, a software application. Defs.' Facts at ¶ 139; Pls.' Resp. at ¶ 139. "VZ Time is Verizon's timekeeping system." Training Materials at 1. The memorandum explaining VZ Time references the Verizon Code of Conduct and its mandate to "keep accurate records regarding [] work time." *Id.* "IEX[] sends [an employee's] schedule, start/stop times, and exception time codes to VZ Time." *Id.* The defendants argue the use of IEX and VZ Time do not demonstrate joint employer status because "IEX is software widely used by call-center employers across a variety of industries." Defs.' Mem. at 30. The court rejects the logic of the defendants' argument, but still finds that the subsidiaries' use of IEX and the VZ-Timekeeping system do not constitute evidence of joint employer status.

The court rejects the defendants' argument because whether other companies rely on IEX is irrelevant to the plaintiffs' argument that VCI implemented a company-wide time-keeping policy. However, the court finds that the mere fact that Verizon subsidiaries abide by the same time-keeping policy does not demonstrate that VCI is a joint employer because "requirements imposed in the context of quality control and branch uniformity do not manifest an employer-employee relationship." *Jimmy John's*, 2018 WL 3231273, at *20. Further, the plaintiffs provide no evidence that VCI selected and implemented the IEX and VZ-Timekeeping system.

The court also notes that software was not entirely uniform across these subsidiaries. From December 2015 until Ms. Johnson's termination in October 2018, Ms. Johnson and others in her department used Rockwell, CALI, and Workhub in addition to other programs to receive and handle customer calls. Defs.' Facts at ¶ 115; Pls.' Resp. at ¶ 115. At Verizon Pennsylvania, Ms.

Roper used the Avaya system to receive calls and the CoFEE database to access customer account information. Defs.' Facts at ¶ 84; Pls.' Resp. at ¶ 84.

*ii.*     *Adherence Standards*

The plaintiffs contend that "VCI set adherence standards to measure all customer-facing V-Team members' ability to clock-in and clock-out according to their scheduled work times, monitored employees' adherence rates on a daily basis and monitored V-Team members' job performance, , on their adherence ratio." Pls.' Opp'n Mem. at 12. The plaintiffs base this contention on their depositions and a sample adherence report.

In the portion of Ms. Johnson's deposition that the plaintiffs cite to support this contention, counsel asked Ms. Johnson "Do you know who set your adherence numbers?" to which she responded: "The supervisor who would be looking at the adherence—whoever your given supervisor or POC, point of contact, whoever." Johnson Dep. at 165:20–24. Her point of contact would have been Ms. Davis or "an acting supervisor" while her supervisor was off-site. *Id.* at 166:3–7. When asked who set her adherence number, Ms. Johnson responded "[p]robably the management team. Probably, you know, them looking at the numbers, people in that department." *Id.* at 166:8–14. This statement sheds no light on whether VCI was involved in generating adherence standards. Similarly, no portion of Ms. Roper's deposition discusses VCI's relationship to adherence.

The sample adherence report provides no connection to VCI. *See* Pls.' Ex. 13, Doc. No. 62-16. The only names on the form are Ms. Roper's and Cindy Cillo. Ms. Cillo is not a VCI executive, 2018 10-K at ECF p. 8, or a VCI officer, Pls.' Ex. 6.

*iii.*     *Callback Standards*

The plaintiffs assert that "VCI set, promulgated and applied 'callback' standards to measure the ability of customer-facing V-Team members to provide solutions that avoided repeated calls for the same issue, which was a key performance metric." Pls.' Opp'n Mem. at 12. The plaintiffs cite Ms. Roper's and Ms. Johnson's depositions to support this contention. However, the portions of the depositions that the plaintiffs cite do not support the notion that VCI implemented these callback standards.

In Ms. Johnson's deposition, counsel asked her about "three-day call backs" and she confirmed that callbacks were "[a] goal [call center representatives] had to achieve[.]" Johnson Dep. at 167:14–20. When asked who set that goal, Ms. Johnson responded "the management team. I would think the management team did it." *Id.* at 168:3–4. She confirms that the management team is on-site and local at Rolling Meadows and Elgin—the two sites where she worked. *Id.* at 167:5–6.

Ms. Roper, on the other hand, tries to connect the callback standards to VCI. In her deposition, she claims VCI set the callback standards

> [b]ecause they're consistent with all the other centers that [she's] aware of. There's people that know people in other centers. [She] know[s] somebody that's in another center that [she] met on different trips and things like that and you know you just kind of talk or you can send screen shots of different things back and forth through IM, and it all looks the same.

Roper Dep. at 205:10–18. However, the "[p]laintiff's self-serving, subjective belief that" these callback standards come directly from VCI "must be corroborated by other evidence; conclusory or speculative testimony in affidavits and moving papers is insufficient to raise a genuine issue of fact and defeat summary judgment." *Urrutia v. Chipotle Mexican Grill, Inc.*, Case No. CV 16-2065, 2017 WL 2901717, at *15 (C.D. Cal. June 16, 2017) (citing *Thornhill's Publ'g Co. v. GTE*

*Corp.*, 594 F.2d 730, 738 (9th Cir. 1979)). Further, while Ms. Roper claims that VCI set the callback standards, she does not assert that VCI reviewed whether she was meeting these metrics and making on-site decisions about how to implement them.

*iv.    Other Standards*

The plaintiffs argue that "VCI set, promulgated and applied dozens of other standards used to track and assess customer-facing V-Team members' work performance, inform their semi-annual reviews and provide work-related rewards and incentives." Pls.' Opp'n Mem. at 12. To support this claim, the plaintiffs cite sample mid-year assessments.[21] However, it is clear that on-site managers wrote and evaluated the plaintiffs for the mid-year assessments. Isaiah Wiggins filled out all of Ms. Johnson's assessment and wrote specific information about her on-site performance. Pls.' Ex. 14.[22] Mr. Wiggins was Ms. Johnson's direct supervisor at Cellco. Johnson Dep. at 22:13–15. James Joseph wrote all of Ms. Roper's assessment. Pls.' Ex. 14. Mr. Joseph was Ms. Roper's direct supervisor at Verizon Pennsylvania. Defs.' Ex. 8, Decl. of James A. Joseph at ¶¶ 4–5, 19, Doc. No. 43-9.

Ms. Johnson and Ms. Roper both discussed rewards and incentives for meeting particular Verizon benchmarks in their depositions. Again, however, neither plaintiff provides any evidence that these rewards, incentives, or benchmarks came from VCI. *See* Johnson Dep. at 180:18–25 (describing Verizon awards for "top performers"); Roper Dep. at 89:1–8 ("[T]he incentives that we have are attached to your performance. You start to get in a mind frame that you almost don't care what you need to do, you just want to do your job so you can make it to the trip, so you can make it in the top tier of bonus.").

---

[21] These sample assessments are akin to the "standard performance review form[s] for evaluating employees of subsidiaries" that Enterprise Holdings, Inc. provided to subsidiaries. *Enterprise*, 683 F.3d at 466.
[22] This exhibit was filed under seal.

46

      *v.*     *Service Relating to All of "Verizon's" Products and Services*

The plaintiffs appear to argue that VCI had authority over work rules and assignments insofar as they and "all customer facing V-Team members at Verizon Pennsylvania and [Cellco] worked as 'universal reps' for 'Verizon' and were required to field calls from all 'Verizon' customers, answer questions about all 'Verizon' products and services, provide support for all 'Verizon' products and services and sell all 'Verizon' products and services." Pls.' Mem. at 8; *see also* Pls.' Mem. at 17. The defendants do not specifically address this point in their submissions. This point, while seemingly an aspect of employment that would occur in most, if not all, products- or service-based industries involving a parent corporation and its subsidiaries, leans slightly toward VCI having authority regarding assignments. This is mitigated, however, by the fact that, for example, Ms. Johnson indicated that the requirement for the call center employees to be "seamless across all of [Verizon's] channels" came from the management of Cellco. Johnson Dep. at 12:5-9, 199:21-200:15. The plaintiffs do not identify any evidence that this direction came from VCI.

      *vi.*     *Benefits*

Although the defendants claim that the plaintiffs do not address the issue of benefits, *see* Defs.' Mem. at 7 ("Meanwhile, Plaintiffs say nothing about compensation, benefits and hours because they have no bases to argue that VCI is involved in setting any of those."), the plaintiffs argue "VCI provides 'V-Team' members with multiple benefits, including wages, bonuses, training, healthcare and retirement plans." Pls.' Opp'n Mem. at 7. In support of their factual claim, they cite to three deposition transcripts and to the Code of Conduct. *See id.* at 7–8.

With regard to the deposition transcripts, Kimberly A. Barna, Director of a Verizon Pennsylvania call center in Robinson Township, Pennsylvania, initially testified twice that she did not know whether Verizon employees were compensated under the Code of Conduct. Dep. of

Kimberly A. Barna at 72:3-21, Doc. No. 62-4; *see* Decl. of Kimberly A. Barna at ¶ 5, Doc. No. 43-19 (indicating that she is "the Director of the call center located at 5400 Campbells Run Road in the Pittsburgh suburb of Robinson Township, Pennsylvania[.]"). When the plaintiffs' counsel inquired as to why Ms. Barna did not know the answer, she explained that non-union employees' compensation was set by the Code of Conduct; whereas, union employees' compensation would be altered to the extent required by any collective bargaining agreement. *Id.* at 72:22-73:9.

As for the other two depositions cited by the plaintiffs, the first is Ms. Glennon's deposition, wherein she testified that "[a] Verizon entity is responsible for overseeing the benefits that [Verizon employees] receive from Blue Cross/Blue Shield or any other benefit that's provided to [them]." Glennon Dep. at 85:19-22. The second is the deposition of Karen Shipman, a legal support manager for Corporate Service Resources, which is "under the VCI umbrella of companies." Dep. of Karen Shipman ("Shipman Dep.") at 7:1-23. In her deposition, the plaintiffs' counsel asked Ms. Shipman whether the entitlement and receipt of benefits (such as health benefits, dental, vision, and a 401(k)) was governed by the Code of Conduct, and she responded: "I would assume so since I agreed to this, yes." *Id.* at 46:3-24. Later in the deposition, the plaintiffs' counsel asked Ms. Shipman whether Cellco employees "receive benefits set by the Code of Conduct," and she responded: "I'm going to say yes because they're an employee." *Id.* at 80:4–16.[23]

The issue that the court has with this testimony is that it is utterly unsupported by the Code of Conduct, which sparsely references benefits. In this regard, the plaintiffs cite to two sections of

---

[23] The plaintiffs also cite to a portion of Ms. Shipman's deposition in which the plaintiffs' counsel questions her about a printout of her benefits of employment. *see* Pls.' Statement of Genuine Issues at ¶ 21 (citing Shipman's Dep. at 97:10-99:24). The court cannot discern how that portion of the deposition transcript is relevant here, and it does not support the explanatory parenthetical attached to the citation.

the Code, sections 3.3.1 (Company Benefits) and 3.3.3 (Work Time). Section 3.3.1 states as follows:

> Verizon's benefits plans and programs are provided as compensation and must be used honestly. You must not misrepresent your health status, your covered members, your beneficiaries, or any other facts, including reasons for absence, in order to claim benefits to which you or others are not entitled.

Code of Conduct at ECF p. 21. Section 3.3.3 provides as follows:

> You must keep accurate records regarding your work time. You may not instruct another employee to misreport or fail to report any time worked. Overtime eligible employees must report all time worked. By submitting your time, you are representing that you have accurately reported your time and that you have not performed any work not reported. You may report any questions about time reporting, or any concerns you have about the accuracy of your wages, including any claim that you have not been paid for all hours worked, or that any deductions from your wages are improper or in error, to Human Resources, the Verizon Services Payroll Department or to the VZ Compliance Guideline.

*Id.*

Any reasonable reading of these provisions establishes that they do not provide VCI with any authority relating to compensation, benefits, and work schedules. It is also very unclear how the witnesses could possibly state that these provisions provide them with anything pertaining to compensation, benefits and work schedules.[24] At bottom, this evidence surely does not establish that Verizon had authority relating to compensation, benefits, and work schedules. At best, it is a disputed issue of fact, although again, no reasonable juror could possibly conclude that the two provisions provide VCI with any authority.

Also, while the court will discuss this in more detail later in this opinion, nothing in the record demonstrates the VCI makes choices or oversees the implementation of benefits. *See* Glennon Dep. at 85:1-3 ("Do you know who runs the programs, the benefit programs?" "No."). In

---

[24] If a Verizon employee brought an action against a Verizon entity and were trying to claim that they were entitled to certain benefits or anything regarding their hours and solely used these provisions to support their legal action, their action would not survive a motion to dismiss.

addition, even though VCI created the Code of Conduct, it does not actually obligate or authorize VCI to do anything with regard to benefits, compensation, or work schedules. Further, for Verizon Pennsylvania, VCI does not make decisions about benefits because the collective bargaining agreement guides those decisions. Glennon Dep. at 72:25–73:9 (confirming "all of the union employees who work for Verizon receive compensation as provided by the code of conduct with consideration for whether their—the collective bargaining agreement governs their employment changes that in any way[.]"). The Verizon Labor Relations Department negotiates the collective bargaining agreement with the Union. The plaintiffs assert that VCI controls the labor relations department. The only piece of evidence that the plaintiffs use to support this assertion is Ms. Glennon's deposition, where she explains "Verizon Labor Relations Department" is "responsible for all collective bargaining agreements applying to the V Team[.]" Pls.' Resp. at ¶¶ 22, 24, 32, 41–42, 96, 99, 101; Pls.' Ex. 2 at 61:15–63:4. This statement provides no evidence of any such authority to control or actual control on the part of VCI.

### 3. Applying *Enterprise*: Day-to-Day Supervision, Including Employee Discipline

Ms. Roper and Ms. Johnson's day-to-day supervision was undoubtedly in the hands of their respective on-site managers at Verizon Pennsylvania and Cellco. Managers carefully monitored Ms. Roper on a daily basis. Defs.' Facts at ¶ 85; Pls.' Resp. at ¶ 85. As Ms. Roper explained that the managers

> would talk to [call center representatives], hold conversations, send [them] instant messages, walk over to [them], tell [them] to put [the] customer on hold while they talk to [the call center representative. They would be sitting there with a headset listening to [the] call side by side while they carry on conversations with [the call center representative] about what exactly they want [the representative] to say.

Defs.' Facts at ¶ 85; Pls.' Resp. at ¶ 85. Call center managers went through Ms. Roper's calls with a "fine tooth comb." Defs.' Facts at ¶ 86; Pls.' Resp. at ¶ 86.

After many complaints and direct observations of Ms. Roper's poor work performance, on-site managers disciplined her multiple times without any input from VCI representatives. Each of these disciplinary meetings involved an on-site supervisor, Ms. Roper, and a Union representative. The plaintiffs provide no evidence of VCI executive or officer involvement in Verizon Pennsylvania's day-to-day management of employees like Ms. Roper.[25]

Ms. Johnson faced similar scrutiny from on-site managers at her job. Ms. Johnson testifies that on-site managers who sat at workstations a few feet away from her own, closely monitored her on a daily basis. Defs.' Facts at ¶ 116; Pls.' Resp. at ¶ 116. These managers would instant message her, tap her on the shoulder, and "micromanage" her. Defs.' Facts at ¶ 117; Pls.' Resp. at ¶ 117. Other managers in the call center, such as Khem Davis, listened to Ms. Johnson's calls from elsewhere in the call center and approached her after the calls to coach her. Defs.' Facts at ¶ 118; Pls.' Resp. at ¶ 118. There are at least fifty-one documented incidents of times when on-site managers coached Ms. Johnson and issued reports and warnings concerning Ms. Johnson's performance. Defs.' Facts at ¶ 122 (A)-(YY); Pls.' Resp. at ¶ 123. The plaintiffs provide no evidence of VCI executive or officer involvement in Cellco's day-to-day management of employees like Ms. Johnson.

At bottom, the plaintiffs have introduced no evidence of VCI's involvement in Verizon Pennsylvania or Cellco's day-to-day management of them, including imposing any discipline. Instead, they assert that "VCI's broad control over Verizon's business includes the ability to directly [sic] and supervise employees' performance in [various] ways[.]" Pls.' Mem. at 19. The

---

[25] As already explained, on this third factor, the plaintiffs misinterpret *Enterprise*. *See* Pls.' Mem. at 19 ("VCI again misinterprets the *In re Enterprise* test. The third *In re Enterprise* prong does not ask if a company alleged to be a joint employer <u>actually supervised or disciplined a specific employee</u>, but if the company <u>has the authority to supervise or discipline</u>." (citing *Enterprise*, 683 F.3d at 469)). While the overall inquiry in *Enterprise* is an examination whether the alleged joint employer exercised significant control over the plaintiffs, the third factor looks at the alleged joint employer's actual "involvement in day-to-day employee supervision, including employee discipline." 683 F.3d at 469. The word "authority" is not mentioned in the Third Circuit's recitation of this factor.

court has already explained why the record does not demonstrate even a disputed issue of material fact as to whether supervisors and managers at Verizon Pennsylvania or Cellco are employees of VCI. The plaintiffs' reference to VCI's purported ability, even if true, does not lead to this factor weighing in their favor. Instead, it weighs in favor of VCI.

4.    **Applying *Enterprise*: Control of Employee Records Including Payroll, Insurance, Taxes, and the Like**

The defendants contend VCI had no actual control over the plaintiffs' records, and, therefore, this factor weighs against a joint employer determination. Defs.' Reply Mem. at 9. The plaintiffs contend that this prong weighs in favor of denying summary judgment because the question is not whether the alleged joint employer "is the actual or sole custodian of its employees' documents and records, it asks if the company has the authority to access and control those documents and records." Pls.' Opp'n Mem. at 21 (citing *Enterprise*, 683 F.3d at 469). As with the last factor, the plaintiffs mischaracterize the *Enterprise* test, which specifically asks about "the alleged employer's *actual control* of the employee records, such as payroll, insurance or taxes." *Enterprise*, 683 F.3d at 469 (emphasis added); *see also In re Domino's Pizza Inc.*, No. 16-CV-2492 (AJN)(KNF), 2018 WL 4757944, at *7 (S.D.N.Y. Sept. 30, 2018) ("[T]he ability to access records is not the relevant inquiry.").

The record shows that VCI has no control over employee records, such as payroll, insurance, taxes, and the like. Verizon creates and maintains call center representatives' personnel files in the specific locations where those representatives work. Defs.' Facts at ¶ 58; Pls.' Resp. at ¶ 58. Call center managers locally create, keep, and maintain records beyond personnel files, including disciplinary information related to grievance meetings, sick day records, attendance and tardy records, disability-absence records, medical restrictions, and FMLA use. Defs.' Facts at ¶ 58; Pls.' Resp. at ¶ 58.

The plaintiffs claim that VCI controls two specific types of documents: payroll and taxes. The court discusses the payroll documents first and then the tax documents.

The plaintiffs contend that the same payroll system processes their payroll and suggests that "Plaintiffs are entitled to an inference that this is a Verizon payroll system that VCI operates, controls and may access as needed." Pls.' Opp'n Mem. at 21. While Ms. Roper's and Ms. Johnson's payroll stubs bear a resemblance in format, neither one indicates the payor is VCI or uses VCI's name in any capacity. Rather, each paystub bears the name of each employee's respective subsidiary. Pls.' Ex. 19, Doc. No. 62-22. The mere fact that the paystubs look similar does not demonstrate that VCI actually cut the checks or had any control over them.

Even if the plaintiffs were entitled to an inference that the same company generated the paystubs, it would not mean that this factor weighs in favor of joint employment. In *Talarico v. Public Partnerships, LLC*, Public Partnerships, LLC ("PPL"), the alleged joint employer, "handle[d] all payroll functions and unemployment and tax withholdings." Civ. A. No. 17-2165, 2020 WL 438045, at *3 (E.D. Pa. Jan. 28, 2020). The "payroll checks" bore "PPL's name and logo on the check[.]" *Id.* Nonetheless, the court granted summary judgment on the joint employer issue because "there [was] no evidence that PPL maintained employee records outside of the payroll records that it contracted . . . to handle." *Id.* at *9; *see also Jean-Louis v. Metro. Cable Commc'ns, Inc.*, 838 F. Supp. 2d 111, 130 (S.D.N.Y. 2011) ("[T]his is not a case where a putative joint employer signs off on time sheets completed by each plaintiff . . . and then provides records of the hours worked to the [alleged joint] employer who uses the records to compensate the plaintiff on a per-hour basis." (internal quotation marks and alterations omitted)).

The plaintiffs argue that "[c]oncerning tax documents, Plaintiffs have introduced substantial evidence demonstrating that VCI owns, and controls the finances of, all subsidiaries"

and that "[a]s a result of its ownership of Verizon, VCI's regulatory filings necessarily address tax issues and obligations relating to Verizon companies and their employees." Pls.' Opp'n Mem. at 22. While it is true that Verizon files tax information on behalf of the entire company structure, this is not the relevant inquiry in the *Enterprise* test.[26] Rather, the question focuses on control of an individual employee's file. Here, there is no evidence to demonstrate VCI had control over and maintained the records of Ms. Roper and Ms. Johnson.

In fact, after Cellco terminated Ms. Johnson, Ms. Johnson requested a copy of her personnel file by tendering a request to Katherine Grimaldi—an on-site human resources manager at the Rolling Meadows Call Center where Ms. Johnson worked. Defs.' Facts at ¶ 137; Pls.' Resp. at ¶ 137. Employee records are maintained locally. Defs.' Facts at ¶ 138; Pls.' Resp. at ¶ 138. Ms. Grimaldi mailed a copy of Ms. Johnson's personnel file to her and followed up with an email to confirm Ms. Johnson received it. Defs.' Facts at ¶ 138; Pls.' Resp. at ¶ 138.

This set of facts comports with Verizon's policy to create and maintain call center representatives' personnel files in the specific locations where those representatives work. Defs.' Facts at ¶ 58; Pls.' Resp. at ¶ 58. Call center managers locally create, keep, and maintain records beyond personnel files, including disciplinary information related to grievance meetings, sick day records, attendance and tardy records, disability-absence records, medical restrictions, and FMLA use. Defs.' Facts at ¶ 58; Pls.' Resp. at ¶ 58.

At bottom, the undisputed evidence of record shows that Cellco and Verizon Pennsylvania maintained and controlled the plaintiffs' records, and, even to the extent that it is reasonable to infer that, for example, another shared-services entity processes payroll for VCI's subsidiaries,

---

[26] If this was the test, any parent corporation would seemingly satisfy this fourth factor merely by properly maintaining tax records.

there is no evidence that VCI had actual control of any employee records, including the plaintiffs' records.

## 5.   Applying *Enterprise*: Any Other Relevant Factors

Although not identified as "factors," the plaintiffs assert that there are "two more important considerations that plainly support VCI's joint employer status."[27] Pls.' Mem. at 22. The first of these considerations is the very broad definition of "employer" in the FLSA. *Id.* at 23. As the court has already referenced the breadth of this definition and recognizes the remedial policies underlying the FLSA, the court will not address this again here.

The second of these considerations is VCI's "exceptional degree of control over every aspect of Verizon's business." *Id.* at 23. They argue that

> [w]here an entity retains extensive control over the business where a group of employees work – control that includes determining the scope and nature of their daily work, setting the policies and procedures they must follow on a daily basis, monitoring their use of company systems, networks, property, devices, facilities and services, determining their access to benefits and making them subject to discipline for any violations of its policies and much more . . . "the total employment situation and the economic realities of the work relationship" plainly dictate that employer should be considered an employer.

*Id.* (citations omitted).

As the plaintiffs are seemingly raising the concept of actual control here, the court will address it. Contrary to their assertion, the overwhelming evidence in the record shows that VCI did not have an exceptional degree of control over the plaintiffs or their places of business. The evidence shows that Verizon Pennsylvania and Cellco, and not VCI, were involved in hiring and firing their call-center employees. To the extent the plaintiffs expressed their beliefs that VCI was

---

[27] The court notes that in *Enterprise*, one of the additional factors identified by the plaintiffs was the "interlocking directorates of the Board of Directors of each of the subsidiaries" shows a "degree of control that would classify it as an employer." 683 F.3d at 470. The plaintiffs here do include a similar argument, which they incorporated into their contention relating to the first *Enterprise* factor. *See* Pls.' Mem. at 15. The court addressed their argument in that portion of this opinion.

somehow involved in their discipline or, with respect to Ms. Johnson, her firing, those beliefs are unsupported by any actual facts.

VCI also was not involved in actually controlling records relating to the plaintiffs or other employees of Verizon Pennsylvania or Cellco. All of those records were kept locally.

There is no evidence that VCI established the plaintiffs or any other call center employees' compensation, benefits, work schedules, or the rate and method of payment. While there are job descriptions posted on the "Verizon" website, there is no evidence identified by the plaintiffs that VCI drafted those job descriptions.

The only evidence showing any control by VCI is the promulgation of the Code of Conduct as it created a set of mandatory rules applicable to all employees of VCI's subsidiaries. Yet, the evidence in the record shows that VCI's exercise of control pursuant to this Code does not go nearly as far as the plaintiffs contend. For example, the Code indicates that Verizon employees' will be monitored in certain ways, such as to see if they are using the company network inappropriately. Although VCI issued the Code, it does not state that VCI will actually be the entity monitoring them, and there is no evidence identified showing that VCI did so.[28] *See Urrutia v. Chipotle Mexican Grill, Inc.*, Case No. CV 16-2065, 2017 WL 2901717, at *14 (C.D. Cal. June 16, 2017) (concluding that company handbook, "which broadly outlines policies and procedures to be implemented in [the parent entity's] restaurants around the country "fails to support a reasonable inference that the parent entity . . . implemented the policies or otherwise exercised day-to-day control over [the subsidiary's] workers' daily activities"). In addition, while the Code

---

[28] The plaintiffs have not demonstrated that VCI lies behind company-wide policies and programs. In this way, the case is similar to *Urrutia v. Chipotle Mexican Grill, Inc.*, where the "Plaintiff's evidence d[id] not reasonably support an inference that the term, 'Chipotle,' as used in the Crew Handbook refers to 'Chipotle Mexican Grill, Inc.' to the exclusion of Chipotle Services, LLC[,] . . . [which is] a subsidiary of CMG." Case No. CV 16-2065, 2017 WL 2901717, at *14 (C.D. Cal. June 16, 2017). Similarly, here, there is no evidence to demonstrate that by use of the word "Verizon," various subsidiaries are not implementing the corporate policies and rules set forth in the Code of Conduct.

indicated that Verizon employees could be subject to discipline, including termination, for certain violations of the policies and rules set forth in the Code, there is no evidence in the record that VCI was actually involved in any day-to-day supervision or discipline of call-center representatives directly employed by Verizon Pennsylvania or Cellco. Even the plaintiffs' reference to the possible involvement of the Labor Relations Department does not indicate VCI involvement because there is no evidence, other than that employees there would also be part of the V Team, that members of the department were VCI employees.

Also, while the plaintiffs have pointed out that employees at call centers had to be "universal reps" for Verizon insofar as they needed to be able to provide support and answer questions relating to, *inter alia*, all Verizon products and services, there is no indication that VCI was actually directing these employees' daily activities and tasks. That type of direction and supervision occurred locally by supervisors and managers at Verizon Pennsylvania and Cellco, as demonstrated by the plaintiffs' own experiences while employed there.

At bottom, the evidence in the record did not show that VCI exercised an "exceptional degree of control over every aspect of Verizon's business," or more specifically, the plaintiffs and the other call center employees of its subsidiaries, Verizon Pennsylvania and Cellco.

### 6.    Applying *Enterprise*: Weighing the Factors

As indicated above, the first, third, and fourth factors weigh heavily in favor of determining that VCI was not a joint employer of the plaintiffs or the other call-center employees. With regard to the second factor, although the Code of Conduct shows indirect control of certain work rules and even if the direction came from VCI regarding call-center employees needing to be able to provide support for all of Verizon's products and services, this factor only minimally leans towards a finding of joint employment (and a disputed issue of material fact as to this factor) because the

record does not show that VCI had the authority to set compensation, benefits, schedules, or rates or methods of payment. After considering the plaintiffs' total employment situation and the economic realities of their relationships, VCI was not a joint employer of the plaintiffs or the other call-center employees.

## IV.    CONCLUSION

The plaintiffs have not provided evidence that there is a triable issue of material fact as to VCI's status as a joint employer of the plaintiffs. Upon review of the record, the court finds that the four *Enterprise* factors weigh in favor of granting the defendants' motion for summary judgment and even though one factor partially favors the plaintiffs, no reasonable juror could find that VCI was the plaintiffs' employer.

The court will enter a separate order.

BY THE COURT:


/s/ *Edward G. Smith*
EDWARD G. SMITH, J.